514 F.2d 8
 88 L.R.R.M. (BNA) 3243, 76 Lab.Cas. P 10,758
 ALTEMOSE CONSTRUCTION COMPANY and Energy Contracting Co., Petitioners,
v.
NATIONAL LABOR RELATIONS BOARD, Respondent.
 No. 74-1402.
 United States Court of Appeals,
Third Circuit.
 Argued Dec. 10, 1974.
Decided March 14, 1975.
 
 John W. Pelino, Martin R. Lentz, Max L. Lieberman, Pelino, Wasserstrom, Chucas & Monteverde, Philadelphia, Pa., for petitioners.
 Joseph E. Mayer, Michael F. Messite, Peter G. Nash, John S. Irving, Jr., Patrick Hardin, Elliott Moore, Washington, D. C., for respondent.
 Before ALDISERT, ADAMS and HUNTER, Circuit Judges.
 OPINION OF THE COURT
 JAMES HUNTER, III, Circuit Judge:
 This is a petition by Altemose Construction Company (hereinafter "Altemose") and Energy Contracting Company ("Energy"), wholly owned subsidiaries of Altemose Enterprises, Inc. ("Enterprises"), to review and set aside an order of the National Labor Relations Board issued against them on April 18, 1974. The Board, which has cross-applied for enforcement of its order, found that Altemose and Energy were joint employers or a single employer within the meaning of the National Labor Relations Act, and that they violated sections 8(a)(1) and (3) of the Act, 29 U.S.C. §§ 158(a)(1) and (3), by discharging employees John J. Zaleski and Norman Young on Februrary 28, 1973, for engaging in protected union activities. We reverse and remand.
 This case arises out of highly unusual circumstances. In the background is the history of an intense and violent labor dispute between Altemose and the Building and Construction Trades Council of Philadelphia, over Altemose's refusal to sign a "subcontractor's agreement" which would obligate it to let subcontracts exclusively to firms using only unionized labor. The dispute reached a climax during the summer of 1972, after Altemose had been awarded the general contract for the construction of a hotel and office building complex in King of Prussia, Pennsylvania, known as the Valley Forge Plaza. In the morning of June 5, 1972, approximately 1,000 men from the Trades Council arrived at the Plaza construction site in buses chartered by one of the Council's member unions and proceeded to destroy vehicles, equipment and other property belonging to Altemose, causing damage in excess of $350,000. Although Altemose immediately obtained a preliminary injunction in state court prohibiting picketing by members of the Trades Council within one mile of any Altemose site or its office building, a second mob descended the following day on the office of Altemose Enterprises and threatened to burn it down. Violence was prevented only through the combined efforts of state and local police. Subsequently, on August 17, J. Leon Altemose was attacked and beaten by members of the Trades Council in broad daylight, while attempting to enter a bank in downtown Philadelphia.
 
 
 1
 Members of the Trades Council also put pressure on the employees at the construction site to cease working for Altemose. Edward Fitzpatrick, a business agent for one of the member unions in the Trades Council, called one of the subcontractors on the site, Richard Czeiner, and told him that the unions would prefer that he not work there. Czeiner refused to quit, however, and subsequently several of his vehicles were destroyed or damaged by fire bombs. Despite strong security measures taken by Altemose, construction on the project was plagued by sabotage.
 
 
 2
 As a result of the violence and threats, many subcontractors withdrew from the site and Altemose and Energy had considerable difficulty in obtaining qualified workers willing to risk work there. The shortage of qualified plumbers was particularly acute, with James Dull, the manager of Energy, being the only plumber on the site initially. When at the end of July, Zaleski went to the Altemose offices seeking employment as a plumber, Roger Altemose was pleased and asked if he knew of any other plumbers who would be willing to work at the site. Zaleski mentioned Young's name, and Altemose suggested that both he and Young get in touch with Dull.
 
 
 3
 After beginning work for Dull, Zaleski and Young were frequently critical of working conditions and were known as the "union men" because of their continued advocacy of unionization. Once, after apparently polling the employees and finding that a majority desired unionization, Zaleski and Young went to see Edward Fitzpatrick (the same individual who had urged Czeiner to quit working on the site, prior to the fire-bombing of Czeiner's vehicles) to seek help in organizing a union. However, Fitzpatrick expressed no interest.
 
 
 4
 At the hearing, Zaleski testified that, on several occasions during the period immediately prior to their discharge, Altemose officials threatened employees with discharge explicitly because of their "union activities." One occasion allegedly occurred on the evening of February 26, at a meeting called by Leon Altemose at the Riverside Speakeasy to discuss the company's current position with regard to its problems with the Trades Council. Zaleski testified that at this meeting, and at prior ones, Leon Altemose stated that any employees who were found to be engaged in union activities would be "weeded out." Zaleski also testified that later that night, Roger Wheale, the foreman at the site, threatened to send him "down the road in the next day or two" because of his "union activities." Similarly, he testified that James Dull, the manager of Energy, threatened him twice, once on the morning of February 26 and once again on the morning of February 28, stating that he (Dull) might lose his job if the "union activities" going on did not cease.
 
 
 5
 Finally, on the afternoon of February 28, Dull allegedly called both Young and Zaleski into the plumbing shop and told them that he was firing them because of their "union activities." The testimony of Young and Zaleski was corroborated by two other employees, Richard Thompson and Anthony Stella, who testified that they overheard Dull state that he was firing the other two because of their "union activities." Stella allegedly heard this conversation while standing outside the open door, and Thompson allegedly heard it while standing behind Dull inside the shop.
 
 
 6
 Dull disputed this account, denying that he told Young and Zaleski that he was firing them because of their "union activities" and stating that Thompson was not in the room at the time and that the door was closed. Dull also said that he fired the two men because of their incompetence, and both he and foreman Wheale testified at length as to the poor quality of the plumbing work done by Young and Zaleski. Counsel for Altemose argued at the hearing that their poor work was due either to incompetence or to sabotage, and he repeatedly stated his belief that the unfair labor practice charges were fraudulent and sought to establish that the two workers were in collusion with the Building and Trades Council.
 
 
 7
 Judge Bisgyer, the administrative law judge, credited most of the testimony of Young and Zaleski, as well as that of Stella and Thompson, and disbelieved the testimony of Dull and Wheale. Furthermore, he found no evidence of improper intervention or influence by the Building and Trades Council in the particular case before him. He therefore concluded that Young and Zaleski had in fact been discharged for engaging in union activities and ordered their reinstatement with back pay.
 
 
 8
 We reverse, however, on two grounds: First, we believe that it was an error under the circumstances of this case to deny Altemose's timely motion to transfer the hearing to another location. Second, we believe that this unusual case merits a more thorough scrutiny into the credibility of the witnesses than Judge Bisgyer appears to have made in his opinion. In our view, Judge Bisgyer failed to evaluate several factors which we believe are important with respect to credibility and excluded some evidence which might have had important bearing on the case.
 
 
 9
 * The motion for change of venue was based on incidents occurring on the first two days of the hearing. The hearing was held in the new William J. Green, Jr., Federal Building, which at the time was still under construction. When Petitioners' counsel and witnesses entered the building on the first day of the hearing, they were jeered by a crowd of approximately 100 workers who had gathered at the entrance. Counsel for Petitioners promptly notified Judge Bisgyer of the incident and requested the Regional Office of the National Labor Relations Board to make appropriate security arrangements. Despite this request, however, no such arrangements were made, and on the second day of the hearing, another crowd prevented Petitioners from entering the building and forced them to flee. The Petitioners were rescued fortuitously by the police in a passing car, and were able to enter the building only with the assistance of United States marshals.
 
 
 10
 Upon obtaining entrance, counsel for Petitioners informed Judge Bisgyer of the incident and requested that the hearing be transferred to a safer location, such as Montgomery County. Judge Bisgyer did not explicitly deny the motion, but told counsel that adequate security precautions would be taken, and the hearing proceeded.
 
 
 11
 We believe that it was reversible error not to grant the motion.[1] One of the most fundamental values in the law is that all legal proceedings, whether conducted in a courtroom or before an administrative agency, should take place in a dignified atmosphere, free of threats and intimidation,[2] and the particular tribunal conducting the proceedings has a heavy responsibility to ensure that such is the case. Conducting a hearing in a mob atmosphere demeans the legal process and may well have an intimidating effect on the witnesses and influence their testimony. Such an effect may be incalculable, and we do not believe it necessary to point to evidence of any actual intimidation. We believe instead that the potential for intimidation was so serious, especially considering the background of this case, that the timely motion for change of venue should have been granted.
 
 
 12
 It is true that no further incidents occurred during the hearing. However, this was only because Petitioners' counsel and witnesses were escorted in through the basement of the building, and they were never once able to pass through the front door. We believe that the National Labor Relations Board has the responsibility to ensure that litigants before it are not subjected to such an indignity of having to run the gauntlet in order to present their case. We thus conclude that the mob atmosphere so tainted the proceedings that we cannot allow the National Labor Relations Board's decision to stand.
 
 II
 
 13
 We also conclude that the case must be reversed and remanded for a reconsideration of the credibility of the witnesses in light of our concerns expressed below. We fully acknowledge that it is not the function of a reviewing court to resolve issues of credibility or to substitute its own judgment on such issues for that of the administrative law judge. What concerns us about this case, however, is Judge Bisgyer's apparent failure, in his evaluation of the witnesses' credibility, to consider various discrepancies in the testimony and a number of other objective factors which we think have important bearing on the believability of the witnesses. Judge Bisgyer tended to disregard this evidence or to restrict presentation of it on the ground that it related to "collateral matters." While such an approach may be proper in many cases, the peculiar background of violence and intimidation in this case and the allegations of collusion between Zaleski and Young and the Trades Council make many of these seemingly collateral matters quite relevant to the process of evaluating the witnesses' credibility. The circumstances of this case thus make it imperative that the administrative law judge consider these factors in making his credibility determinations, and since we find no evidence that he did so, we conclude that we must remand the case for a new hearing with explicit instructions to take these factors into account. We now proceed to enumerate the factors which cause us most concern.
 
 
 14
 First, we see no indication in Judge Bisgyer's opinion that he considered how the relationship between Zaleski and Fitzpatrick might have affected Zaleski's credibility. Fitzpatrick, it will be recalled, was the business agent for one of the member unions in the Trades Council and the person who urged Richard Czeiner, the subcontractor whose vehicles were later bombed, to cease working on the site. Zaleski met with Fitzpatrick at least once during this period, allegedly to discuss unionization of the workers on the construction site, and spoke with him by telephone on several occasions. (N.T. 62-64; 197; 266). Furthermore, on a prior job, Zaleski admitted voluntarily paying 11/2% to 2% of his wages to Fitzpatrick's union because he was very desirous of obtaining a union card (N.T. 141-144). We note that another employee, a man named Doras, obtained membership in another member union after being responsible for the toppling of a crane at the worksite on January 30, 1973. That accident occurred under circumstances[3] that led a Pennsylvania Common Pleas Judge to state in another proceeding that "there is a very good possibility of sabotage having taken place" and that he believed that Doras "was unduly rewarded for the action." (N.T. 903-904). Given these facts and the unusual circumstances of the case, Zaleski's admitted attempts to curry favor with Fitzpatrick's union should have been considered by Judge Bisgyer in evaluating his credibility.
 
 
 15
 In addition, the circumstances of the application by Young and Zaleski for unemployment compensation benefits raise questions which should have been explicitly considered in determining whether to credit or discredit their testimony. Both Young and Zaleski stated that Dull told them at the time he fired them that they could put down that they were let go for lack of materials. Dull admitted this, saying that he told them that in order to make it easier for them to obtain benefits. Zaleski, however, testified that he could not remember the name of the woman who took his claim when he applied for benefits but that he could remember what she looked like (N.T. 96). That woman turned out to be his own daughter, Barbara. (N.T. 128). Young testified that he gave the "real" reason he had been discharged (his engaging in union activities), but could give no explanation why "no materials" was put down on his application, even though he "imagined" that it was filled out in his presence (N.T. 575-577). Such testimony seems to us to have important bearing on the witnesses' truthfulness and should have been considered.
 
 
 16
 We are also concerned about inconsistencies between Zaleski's testimony at the hearing and his sworn affidavit, and we see no indication in Judge Bisgyer's opinion that he considered the bearing these inconsistencies might have on Zaleski's credibility. For example, Zaleski testified that he never stated to anyone that Roger Altemose had said he was not doing his share of the work (N.T. 289), but his own affidavit was contradictory on this point (N.T. 290). Since the question of Zaleski's performance on the job is a crucial issue in this case, we believe that this inconsistency is an important one and should have been explicitly considered by Judge Bisgyer.
 
 
 17
 We also note that Judge Bisgyer specifically refused to accept some of Zaleski's testimony, and yet did accept the thrust of it, especially his version of the crucial February 28 meeting with Dull in the plumbing shop. For example, he stated that Zaleski's testimony that his paychecks were the same color as the stubs was "obviously erroneous."[4] Furthermore, Judge Bisgyer stated that he did not accept Zaleski's testimony that both Leon Altemose and Roger Wheale had, on separate occasions, threatened him with discharge for his "union activities." However, we see nothing in Judge Bisgyer's opinion indicating how his disbelief of some of Zaleski's testimony affected the latter's credibility in general, especially with respect to its impact on Zaleski's self-serving version of the Februrary 28 meeting in Dull's office.[5] This is of particular importance because of Zaleski's frequent attribution of the phrase "union activities" to the Altemose and Energy officials who allegedly threatened him.[6] Such a phrase is a term of art under the National Labor Relations Act, and Judge Bisgyer does not appear to have given sufficient consideration to the improbability of testimony that an employer, counseled by an experienced labor attorney, would use those specific words so frequently[7] or, especially, would tell two employees point blank that he was firing them because of such activities.[8] Since Judge Bisgyer disbelieved Zaleski's testimony when he attributed those very words to Altemose officials on two other occasions, this disbelief would appear to have important bearing on Zaleski's credibility regarding the February 28 incident. In addition, Judge Bisgyer should have explained more fully why he credited some but not all of Zaleski's testimony regarding threatened reprisals for "union activities."
 
 
 18
 Evidence introduced at the hearing also bears on the credibility of the other witnesses. It appears that Young, for example, had previously engaged in what was tantamount to fraud in obtaining unemployment compensation checks when he was not available for work in Pennslyvania (N.T. 492-494). Also, both he and Zaleski had obtained a master plumber's certification under suspect circumstances suggesting forgery.[9] The affidavit of Anthony Stella, one of the corroborative witnesses, appears to have been altered to delete statements which were favorable to Altemose and Energy.[10] Also, in recounting his version of the February 28 meeting in Dull's office, Stella testified that he followed Young to the plumbing shop and overheard Dull fire Young and Zaleski because of their "union activities." However, he made no mention of Thompson, who testified that he entered the shop to get some tools and overheard the firing. Thompson, likewise, made no mention of Stella. From the record as it presently appears, it is difficult to understand how Stella and Thompson could have failed to see each other, and this matter should be explored at any subsequent hearing.
 
 
 19
 There are a few additional points bearing on Thompson's credibility which were not explicitly considered by Judge Bisgyer. First, he was a lifelong friend of Zaleski (N.T. 747). Also, he claimed that he was harassed into quitting his job, and thus he might well have been biased against Altemose and Energy. The only evidence of harassment he could recount, however, was the lateness of his paychecks (N.T. 780), and on cross-examination he admitted that his paycheck was late only on two occasions: once because he had been to work late, and the other time because his time card had been punched early by someone else (N.T. 782-783).
 
 
 20
 The above are the major factors which we conclude are relevant to the witnesses' credibility and which Judge Bisgyer did not explicitly consider. While those are the factors which cause us greatest concern, the administrative law judge on remand should not limit himself to them but should evaluate all the evidence relevant to the witnesses' credibility. Likewise, he should not just consider these factors individually, but should evaluate their cumulative impact as well. We reiterate, however, that the final determination with respect to credibility rests with the administrative law judge, and we are not instructing him to believe or disbelieve any particular witnesses. We are only saying that it is imperative that he take the above considerations into account.
 
 
 21
 In addition, the administrative law judge on remand should reconsider some of the premises on which the credibility determinations were based. For example, Judge Bisgyer credited Stella's testimony because he was "an employee still employed on the project (who) would hardly fabricate testimony against his employer and thus incur his employer's displeasure." While we do not suggest that this reasoning is necessarily fallacious, the administrative law judge should also consider, in this respect, the relevance of section 8(a)(4) of the National Labor Relations Act, 29 U.S.C. § 158(a)(4), which specifically prohibits an employer from discharging or otherwise discriminating against an employee for giving testimony in proceedings before the National Labor Relations Board.
 
 
 22
 Judge Bisgyer also disbelieved Dull's testimony that he told Zaleski and Young that he had fired them because of their poor productivity rather than for their "union activities." Stating that "poor productivity" would have been a sufficient reason for the two to obtain unemployment benefits, Judge Bisgyer concluded that "the only logical explanation for Dull's suggestion (that the two say that they were let go for 'lack of materials') is his reluctance that Zaleski and Young mention his acknowledged illegal ground for the discharge their union activities." This inference does not necessarily follow. Under Pennsylvania law, an employee who is discharged because of lack of production is not necessarily eligible for unemployment compensation, since he is not entitled to benefits if his failure to produce was attributable to " wilful misconduct." 43 P.S. § 802(e). See Philadelphia Transportation Co. v. Unemployment Compensation Board of Review, 186 Pa.Super. 142, 141 A.2d 410 (1958). Because a termination for lack of production might have led to an inquiry into possible wilfulness on the part of Young and Zaleski, there is no reason to discredit Dull's testimony because of his suggestion that they put down "lack of materials," a reason which would be more likely to go unquestioned and to be routinely granted.[11]
 
 
 23
 Judge Bisgyer also discounted the testimony of Dull and Wheale with respect to the incompetence of Young and Zaleski, describing the testimony as "grossly exaggerated and beyond belief." While we do not say that this conclusion was in error, the administrative law judge should reconsider some of the premises on which this conclusion seems to have rested. Judge Bisgyer relied in part on the fact that both Young and Zaleski had obtained a 25-cent hourly wage increase in January, 1973, and on testimony by Roger Altemose that if an employee "isn't doing the job, we tell him to leave. If he's doing an exceptional job, I guess he probably gets a raise." The weight given the statement of Roger Altemose, however, should be reconsidered in light of the fact that he only approved the request for a raise submitted by Dull, and that there was no evidence that he knew at that time that the work of Young and Zaleski was unsatisfactory. Similarly, Dull testified that the increase was made across-the-board to all plumbers or apprentices then working for Energy (N.T. 1503), and before discounting this testimony the hearing examiner should attempt to ascertain the reasons Dull sought the increase and the precise number of employees who benefited. Also, the hearing examiner does not appear to have been entirely accurate when he stated that Young and Zaleski had testified that their work was never criticized. Young in fact admitted that Wheale constantly criticized the way that Zaleski did his work (N.T. 581-582, 587).
 
 III
 
 24
 Finally, we conclude that Judge Bisgyer improperly excluded some evidence which we believe might have been quite relevant to Altemose's defense of fraudulent charges and to its allegation of collusion between Young and Zaleski and the Trades Council. We see no error in the limitation on the questioning of Colson, Silberman and Rodgers, since counsel for Altemose had not made any showing that they were involved in the particular case at hand.[12] With respect to Wayne Natale, however, Judge Bisgyer erred in not permitting more thorough questioning. Counsel for Altemose argued at the hearing that Natale was the attorney in the Philadelphia Regional Office of the National Labor Relations Board who handled the case immediately prior to the filing of the complaint. According to counsel, Natale had been an attorney with a law firm representing several unions in the Trades Council before working for the National Labor Relations Board; had worked for the Regional Office in Ohio until he requested a hardship transfer to Philadelphia; had worked in the Philadelphia office for only twenty days, during which time the complaint was issued, without giving Altemose the opportunity to have a conference with the National Labor Relations Board; and then resigned to return (at least briefly) to the law firm which represented some member unions in the Trades Council (N.T. 1220-1221). If these allegations are true, they raise serious questions about the propriety and impartiality of the investigation, and any evidence of a relationship between Natale and the Trades Council, given the peculiar circumstances of this case, might have been very material to Altemose's defense that the charges filed were fraudulent.[13] We therefore conclude it was error for Judge Bisgyer to prevent counsel from seeking to establish such a relationship (N.T. 1241-1242).
 
 
 25
 On remand, we think that the proper approach should be to allow counsel for Altemose leeway to determine whether in fact there was some relationship between Natale and the Trades Council and, if so, what its nature was. If the questioning fails to establish any relationship, the hearing examiner may prohibit further questioning of Natale. If such a relationship is established, the hearing examiner should permit inquiry into Natale's possible role in the issuance of the complaint. The extent of Natale's relationship with the Trades Council and involvement in the issuance of the complaint should be considered by the hearing examiner in weighing the credibility of the witnesses.[14]
 
 
 26
 For the foregoing reasons, enforcement of the Board's order will be denied, the order will be vacated and the case will be remanded for further proceedings not inconsistent with this opinion.
 
 
 27
 ALDISERT, Circuit Judge (concurring).
 
 
 28
 I join in Parts I and III of the majority opinion. I cannot join in Part II because I believe that this court should respect the Board's credibility determinations in this case.
 
 
 29
 It is the function of the Board to find facts. Inherent in this function is the responsibility to resolve issues of credibility. It is a well-settled principle in this circuit that the Board's credibility determinations are entitled to our respect. NLRB v. Erie Marine, Inc., 465 F.2d 104, 106 n. 3 (3d Cir. 1972); NLRB v. M. Koppel Co., 412 F.2d 681, 685 (3d Cir. 1969); NLRB v. Wings & Wheels, Inc., 324 F.2d 495, 496 (3d Cir. 1963). On the other hand, we have not hesitated to deny enforcement and have remanded where the administrative law judge contributed to a witness' lack of credibility by improperly restricting his testimony. NLRB v. M. Koppel Co., supra, 412 F.2d at 685-86.
 
 
 30
 The majority do not criticize the administrative law judge for improperly excluding testimony relevant to credibility determination. Instead, they fault the administrative law judge for failing to consider explicitly certain record evidence and take exception with certain excerpts of the administrative law judge's credibility reasoning.
 
 
 31
 As Chief Judge Seitz recently stated in Government of the Virgin Islands v. Gereau, 502 F.2d 914, 921 (3d Cir. 1974), cert. denied, --- U.S. ---, 95 S.Ct. 829, 42 L.Ed.2d 839 (1975):
 
 
 32
 It is the law of this Circuit, as well as many others, that a fact-finder's determination of credibility is not subject to appellate review.
 
 
 33
 See also United States v. Harris, 507 F.2d 197 (3d Cir. 1975).
 
 
 
 [1]
 We do not construe counsel's desire to continue questioning the witness who had been called the day before (Zaleski) as a waiver or withdrawal of the motion for change of venue. The colloquy with Judge Bisgyer makes clear that counsel was only rejecting a suggested postponement and not waiving his right to a change of venue (N.T. 185)
 
 
 [2]
 Cf. Moore v. Dempsey, 261 U.S. 86, 43 S.Ct. 265, 67 L.Ed. 543 (1923)
 
 
 [3]
 Doras admitted at the hearing that he started up the crane and then walked away from it, that he was an experienced crane operator, that he knew that it was dangerous to leave a crane unattended like that, that he had had several meetings with the business agent for Local 542 (the member union he later joined) while working on the construction site, and that he joined the union on February 7, 1973, one week after the crane was toppled (N.T. 807-809)
 
 
 [4]
 This testimony was relevant because of Altemose's contention below that Energy, and not it, was the employer of Young and Zaleski. While the stubs introduced into evidence bore the name "Altemose," the cancelled checks did not (except for one on which the word "Altemose" had been crudely printed by hand), and they did not match the size or color of the stubs
 
 
 [5]
 Cf. National Labor Relations Board v. Elias Brothers Big Boy, Inc., 327 F.2d 421, 426 (6th Cir., 1964). We acknowledge, of course, that an administrative law judge is not required to discredit all of a witness' testimony merely because he has discredited some of it. See N. L. R. B. v. Universal Camera Corp., 179 F.2d 749, 754 (2d Cir., 1950), vacated and remanded on other grounds, 340 U.S. 474, 71 S.Ct. 456, 95 L.Ed. 456 (1951). Because of the unusual circumstances of this case, however, we believe that the hearing examiner, in making his credibility determinations, should not have limited himself merely to a consideration of the believability of individual portions of the testimony, but should have taken special care to consider the overall believability of the witness. The fact that Judge Bisgyer disbelieved at least some of the witnesses' testimony seems relevant in this regard
 
 
 [6]
 Zaleski also testified that James Dull threatened him on two occasions, saying that this "union activity" must stop and that he (Dull) was being pressured by Altemose officials to put an end to it. Judge Bisgyer accepted this testimony by Zaleski as not being "specifically contradicted." While Dull may not have "specifically" contradicted Zaleski's testimony on this point, we note that he did deny ever telling the two either that he was firing them because of their union activities (N.T. 1468) or that, on the day he fired them, he had been given instructions from the front office to discharge them (N.T. 1516)
 
 
 [7]
 According to one portion of Zaleski's testimony which Judge Bisgyer refused to credit, Leon Altemose's threats to "weed out" employees engaged in "union activities" were made during at least two meetings with the employees, both of which were attended by Altemose's lawyer who likewise supposedly addressed the workers "on the same subjects." (N.T. 74-78)
 
 
 [8]
 We note that Judge Bisgyer himself observed that "unquestionably it is not common for an employer to bluntly inform employees that their termination was on account of their union activities." However, he also stated that Zaleski's testimony had "the ring of truth."
 
 
 [9]
 Both Young and Zaleski appeared quite evasive about their qualifications, and their testimony on this point was marked by inconsistencies. Both of them had obtained plumber's certificates from the Township of Caln, but counsel for appellants obtained an affidavit from the Manager of Caln Township stating that neither had properly applied for such a card or had posted the necessary bond
 
 
 [10]
 Stella's original affidavit stated that Leon Altemose had made anti-union speeches "but had never actually made any threats" (N.T. 696-697). The second affidavit omitted the portion denying that Altemose had made any threats. Although Stella conceded the truth of the statement later omitted (N.T. 697), he could give no satisfactory explanation why it was omitted. Stella's second affidavit also omitted the statement that Young and Zaleski "never actually tried to organize the plumbers" (N.T. 693)
 
 
 [11]
 Dull testified that he wanted the two to obtain benefits because he realized that it would be difficult for them to get a job at that time of year (N.T. 1470) and because he felt some obligation toward them, since they helped out at a time when Energy had great difficulty obtaining qualified workers (N.T. 1471)
 
 
 [12]
 The questioning of these three was sought as a result of a New York Times article which had stated that Charles Colson, then White House counsel, and his deputy, Donald Rodgers, had tried to put pressure on Lawrence Silberman, the Under Secretary of Labor, to influence members of the Pennsylvania Supreme Court to decide another case in favor of the Trades Council. In that case, the Council was appealing the injunction granted against it by a lower state court following the violence on the Valley Forge Plaza construction site on June 5, 1972. Both Colson and Rodgers were called as witnesses and both testified that they had nothing to do with this case (N.T. 1131, 1184, 1186). Under these circumstances, we do not believe it was error to refuse further questioning of these witnesses or to grant Silberman's motion to revoke his subpoena
 
 
 [13]
 We acknowledge that in most cases questions pertaining to the propriety of an investigation are internal matters which should not be considered at the hearing stage of unfair labor practice cases. We also recognize that section 102.118 of the National Labor Relation Board's rules and regulations prohibit Board employees from testifying in regard to the handling of a case. Where, however, there is a serious allegation that a former employee of the Board had close connections with a union involved in a bitter ongoing labor dispute with a party to a National Labor Relations Board proceeding, and that he was involved in the issuance of the complaint during his tenure at the Board, we believe that the potential conflict of interest was so severe that questioning of the former employee should be permitted
 
 
 [14]
 We note, for example, that the deletions from Stella's original affidavit (see note 9, supra) appear to have been made during the period when Natale was at the Philadelphia regional office