**EASTERN ENGINEERING & ELEVA-TOR CO., INC., Petitioner,**

v.

**NATIONAL LABOR RELATIONS BOARD, Respondent,**

**Local 5, International Union of Elevator Constructors, Intervenor.**

**No. 80–1109.**

United States Court of Appeals, Third Circuit.

Argued Oct. 9, 1980.

Decided Dec. 22, 1980.

---

**192**

Joseph R. Livesey, Lewis Kates (argued), Kates & Livesey, P. C., Philadelphia, Pa., for petitioner.

Peter M. Bernstein, David S. Fishback (argued), Attys. N. L. R. B., Washington, D. C., William A. Lubbers, Gen. Counsel, John E. Higgins, Jr., Deputy Gen. Counsel, Robert E. Allen, Acting Associate Gen. Counsel, Elliott Moore, Deputy Associate Gen. Counsel, N. L. R. B., Washington, D. C., for respondent.

Richard H. Markowitz, Andrew L. Markowitz, Robert C. Cohen (argued), Markowitz & Richman, Philadelphia, Pa., for intervenor.

Before ALDISERT, VAN DUSEN and GARTH, Circuit Judges.

## OPINION OF THE COURT

ALDISERT, Circuit Judge.

■ This case does not require us to decide a novel legal issue. Rather, the controversy turns on application of the substantial evidence standard to a National Labor Relations Board decision that is based on testimonial evidence rejected as incredible by an administrative law judge. Disagreeing with the facts found by the administrative law judge and reversing his decision, the Board determined that Eastern Engineering & Elevator Co., Inc., discharged Robert Shepherd, a mechanic, because of his protected activity, and thereby violated §§ 8(a)(1) and (3) of the National Labor Relations Act, 29 U.S.C. §§ 158(a)(1) and (3).[1] Eastern has petitioned us to review and set aside the Board's order, arguing that it was not supported by substantial evidence. The Board has cross petitioned for enforcement. We will refuse enforcement, grant the petition for review, and set aside the order.

Because the facts form the crux of this case, we will set them forth in detail and highlight the areas of controversy. We will also delineate the testimony that formed the basis of the Board's order. Finally, we will assess the record as a whole, applying the substantial evidence standard set forth at 29 U.S.C. § 160(f), in light of relevant judicial interpretations.

### I.

Eastern, a small Philadelphia, Pennsylvania, firm that installs and services elevators, has maintained a collective bargaining relationship for a number of years with Local 5, International Union of Elevator Constructors. The administrative law judge found, and there is no evidence to the contrary, that the relationship between the company and the union has been good. The union represents Eastern's foremen, mechanics and helpers.

In October, 1978, thirteen of Eastern's helpers took a union-administered mechanic's examination. Five passed and according to company practice they advanced automatically to mechanic status entitling them to a thirty per cent pay increase. Eastern determined that it could absorb only three additional mechanics. Given unfettered discretion by the terms of the collective bargaining agreement, Eastern decided to retain all five of the new mechanics and to lay off two of its existing mechanics.

---

1. There is some dispute over whether Shepherd was discharged or simply laid off. For purposes of our analysis the distinction makes no difference. Either a layoff or a discharge in retaliation for protected activity violates the act.

This case concerns Eastern's decision to lay off Robert Shepherd, one of the two.[2]

Shepherd, the union, and the general counsel maintained that Shepherd was laid off because he filed an internal union charge against a fellow employee. The substance of the charge was that on one occasion the employee, Edward Carswell, had allowed a non-unit person, company president Stephen Zipf, to perform unit work. The incident occurred when Eastern was called to respond to a fire emergency. The general counsel's theory was that the filing of the intra-union charge was protected activity. Eastern denied that it was a factor in the decision and explained that Shepherd was laid off because he was not performing his duties adequately. According to Eastern, Shepherd refused to answer emergency calls, his work was substandard, and he had conflicts with customers, fellow employees, and management.

The administrative law judge found that Eastern had established a non-pretextual legitimate business reason for laying off Shepherd not motivated by Shepherd's charge. The Board rejected the ALJ's findings and concluded that Eastern's explanation was a pretext for impermissible motives.

### A.

Shepherd had been hired by Eastern as a probationary helper in February, 1973, and was promoted to service mechanic in early 1976, a position he held until his layoff on November 15, 1978. He described his duties as routinely servicing elevators on a prescribed route and making immediate repairs in the event of a breakdown.

On cross examination Shepherd at first denied that his duties included answering emergency calls, also known as call–backs, after regular hours. He also denied refusing to answer call-backs. After the collective bargaining agreement was admitted into evidence, the parties agreed that it imposed on Shepherd and other mechanics a responsibility to attempt to answer after-hours call-backs.[3] When confronted with Eastern's records of his refusals to answer specific call-backs, Shepherd conceded that his prior testimony was incorrect. App. at 47.

Shepherd then claimed as an excuse that he no longer had use of a company car and that without it he did not consider himself bound to answer call-backs. Eastern previously had supplied Shepherd with a company car for about one year when his route extended from Perth Amboy, New Jersey, to Wilmington, Delaware. He admitted, however, that Eastern does not supply all of its maintenance mechanics with cars, and that he lost use of the company car when his route was changed to a "walking route" in Center City Philadelphia. Prior to having a company car, Shepherd also serviced Center City buildings and during that time he used his own vehicle to get to and from his route. After losing the car, Shepherd took a trolley to work from his home in South Philadelphia, a distance of about six to eight miles. Shepherd admitted that he left his tools in an inaccessible Center City building after hours and could not do call-back work in any event.

### B.

The alleged unfair labor practice implicated in these proceedings emanated from uncontradicted testimony that bad feelings existed between Shepherd and fellow employee Edward Carswell for a period ex-

---

**2.** Ironically, the other mechanic was Milton Shepherd, Robert's father. His layoff is in no other way related to the present controversy. App. at 137.

**3.** The collective bargaining agreement stated:
Par. 8. It is mutually agreed that for the benefit of the employer, employee and the using public, a special obligation exists on the part of the men engaged in contract ser-
vice to take care of call-backs outside of their regular work hours. It is understood that the obligation on the part of the service men to make overtime callbacks is not intended to impose a mandatory obligation but simply a mutual recognition of responsibility.
*Id.* at 214 (quoting Standard Agreement of International Union of Elevator Constructors, Art. IX, ' 8, July 9, 1977, to-July 8, 1982).

tending over one year. In November, 1977, Carswell had answered a call-back at a building on Shepherd's route and had reported back to Eastern that the problem was caused by Shepherd's incorrect installation of an elevator motor commutator brush. Upon learning of the problem, Eastern's president, Stephen Zipf, directed Carswell to tell Shepherd to check the installation of the brushes in the future.

Shepherd confronted Carswell and complained about his "carrying tales to the boss." Carswell told Shepherd that he would continue to report unsatisfactory work by others and laughed, "I write them like I see them." App. at 21. Shepherd then threatened to file formal charges with the local union against Carswell for reporting his unsatisfactory work to Eastern. Union officials convinced him not to file charges and instead the executive board of the local heard Shepherd's complaint informally, with the understanding that everything said was to be confidential. A few days later, according to Shepherd, Stephen Zipf took Shepherd aside and accused him of causing "undercurrents within the company" and sent Shepherd home for the day. Shepherd concluded that Zipf was referring to his intra-union complaint and that Carswell must have told Zipf about it.

In September, 1978, Carswell accompanied Eastern's President on a Sunday fire emergency call-back at a building on Shepherd's regular route. In responding to this emergency, Stephen Zipf allegedly did some work that by the terms of the collective bargaining agreement could only be performed by members of the bargaining unit. As a qualified mechanic and active member of the union until becoming the president of Eastern, there was no question that Zipf was competent to perform the work. Upon learning that Zipf had acted in this emergency situation, Shepherd preferred charges against Carswell with the local union. His grounds were that Carswell had violated union bylaws by acquiescing in and not

reporting Zipf's performance of work reserved exclusively by the labor contract for members of the bargaining unit. Shepherd did not institute grievance proceedings against Eastern for this alleged breach of contract.

### C.

On November 15, 1978, Shepherd was laid off by Eastern. The General Counsel contended that Shepherd's filing of internal union charges against Carswell almost two months earlier was the motivating factor for his layoff. Shepherd's charge, the general counsel argued, and we will assume without deciding, was protected activity. To link Shepherd's layoff to the charges, the General Counsel offered the testimony of Robert Williams, the union's business manager.

Crucial to the General Counsel's case and the Board's decision was Williams' account of events subsequent to Shepherd's filing of charges against Carswell. Williams testified that on the occasion of a meeting with Stephen Zipf about another matter, Zipf tried to raise the fire emergency incident with him. Williams claimed that he tried to discourage the discussion, saying, "Steve, I don't want to hear this. There [are] charges on this," referring to Shepherd's charge. App. at 85. When Eastern's president persisted in talking about the matter, Williams said he replied: "Steve, I'm not interested in the case. I can't sit and listen to it because there [are] charges coming up. I'm going to be part of it. I'm going to be a witness. I don't want to hear it." *Id.* President Zipf's response, according to Williams, was to say, "That goddamn Bobby Shepherd did that to Eddie Carswell," and he continued, "That goddamn Bobby Shepherd created a problem." *Id.* at 85–86. Williams claimed that Zipf said he would "get even" with Shepherd, which Williams interpreted to mean that Zipf would "get even" with him for filing the charge against Carswell.[4] *Id.* at 86.

4. The ALJ reported that Stephen Zipf was examined only cursorily about this conversation, but denied having made the incriminating statements attributed to him. ALJ opinion at 6, App. at 230. The extent of the questioning was as follows:

This testimony was important because it was the *only* evidence tending to show that Zipf knew about Shepherd's charge against Carswell. To establish that Zipf laid off Shepherd in retaliation for the charge, the General Counsel had to prove Eastern's knowledge. Zipf denied knowing that Shepherd brought union charges against Carswell before the layoff.

Williams acknowledged that prior to the layoffs he had advised Eastern that thirteen of its helpers were taking the mechanic's examination. Zipf told him at that time that if too many helpers passed the examination, Eastern would have to let some mechanics go. When he learned that Shepherd was one of the men affected, Williams called Mark Zipf, vice-president of Eastern, and attempted to ascertain whether the charge influenced the decision. Zipf responded that Eastern had to lay off someone and then gave Williams the option of choosing two other mechanics for layoff if the Local Union did not like the company's choice, but Williams declined. *Id.* at 94.

## II.

Eastern's defense was based on proving that Shepherd's layoff came about because it could not absorb the five new mechanics that had passed the union's examination and because Shepherd performed substandard work. According to Eastern's witnesses all the mechanics were evaluated and the conclusion was that laying off Shepherd would be best for the company. Eastern denied that Shepherd's charge against Carswell had any effect on the evaluation and maintained that it had a legitimate business reason for the decision.

Q. Did you ever have any conversations with Mr. Williams, as he testified, where you used the word "goddamn" in referring to those charges?
A. I don't use that language. I don't use that language.
Q. Was Mr. Williams' testimony truthful?
A. Perhaps he made a mistake, but I don't use that language.
Q. Did you ever speak to him about charges concerning Carswell?

## A.

Stephen Zipf testified that Shepherd was selected for layoff for particular unsatisfactory work incidents and for failing to take call-backs. Moreover, Zipf complained that Shepherd made his own work rules and regulations without regard to other employees, refused to do work, and created problems with Eastern's customers because of his attitude, work habits, and failure to do proper work. App. at 138–44, 162. He testified that all Eastern's mechanics were evaluated in determining who should be laid off. *Id.* at 152–161, 173.

Zipf recounted the incident in November, 1977, when Shepherd was sent home from work after Carswell had reported the problem with the commutator brush on one of Shepherd's elevators. Shepherd, after getting the message from Carswell, came to Zipf's office and appeared very upset, Zipf recalled that Shepherd became abusive and would not listen to Zipf's attempt to discuss the matter with him. As a result of the abuse, Zipf sent Shepherd home for the day. Later that day, union business manager Williams, Carswell, Stephen and Mark Zipf, and Shepherd met to discuss the incident, Zipf testified that at that meeting Shepherd again became abusive and called him a liar and a thief. Williams and Stephen Zipf then met privately and, according to Zipf, agreed to try to make Shepherd "a more [responsible] person and a better mechanic." *Id.* at 133. The meeting then resumed briefly, whereupon Shepherd was warned to control himself but was allowed to return to work.

The Board and the administrative law judge parted company over the credence to be given Williams' description of what was said at this meeting. Although both Shep-

A. No. I had asked Mr. Williams to my office to explain a situation ... [about] unrest in the troops.... [I]t's difficult enough trying to win business and to keep satisfied customers and keep everyone satisfied on their job without having constant unrest between the people, and I, for the second time, had asked Mr. Williams back to our office and we discussed the situation.
App. at 145.

herd and Williams denied that Shepherd called Zipf a liar and a thief, the ALJ specifically credited the testimony of Stephen Zipf.[5] ALJ op. at 4, app. at 228. The ALJ found generally that Williams' and Shepherd's testimony was unworthy of credit.[6]

Stephen Zipf also discussed his meeting with Williams in 1978, the meeting at which Williams claimed Zipf vowed to "get even" with Shepherd. He denied making the statements attributed to him and said that the purpose of the meeting was to discuss the continuing employee unrest fomented by Shepherd's resentment of Carswell. He also wanted to explain the circumstances that caused him to be at the fire emergency. Zipf testified that he did not do any work at the building but happened to be present because Eastern was not being paid by the owner for service.[7]

### B.

Mark Zipf was the company officer primarily involved in the decision to lay off two mechanics and in the choice of Shepherd as one. App. at 184. He said that Shepherd's unavailability for call-back work was of paramount importance in the decision, *id.* at 187, and he confirmed that the other factors described by Stephen Zipf were also significant. Contrary to Shepherd's testimony, he testified that there was no understanding with Shepherd releasing him from call-backs unless he was supplied with a company car. He noted that mechanics with a walking route such as Shepherd do not require and are not supplied with company vehicles but retain the responsibility to answer call-backs. A mechanic asked to make a call-back customarily would be expected either to use his own car or public transportation and he would be paid for his travel time and expenses. In any event, it would be the mechanic's responsibility to have his tools available and to make a reasonable attempt to respond.

### III.

The ALJ found that the General Counsel failed to carry his burden of proving by a preponderance of the evidence that Eastern violated §§ 8(a)(1) and (3) of the Act. His rejection of Williams' and Shepherd's testimony as unworthy of credit was crucial to

5. Williams' testimony on this point was evasive and equivocal:

Q. And didn't you hear Mr. [Shepherd] call . . . Stephen Zipf a liar and a thief?

A. If I may—I can answer that.
Q. I'd like it yes or no.
A. I can't answer yes or no.

Q. Did you hear Mr. Shepherd say the word "thief"?
A. I may have.
Q. Did you hear Mr. Shepherd say the word "liar"?
A. I can't recall that word.

*Id.* at 90.

6. With respect to Williams, the ALJ said: "Williams did not impress me as being so reliable a witness that I should unreservedly accept as accurate all his testimony." ALJ op. at 6, app. at 230. With respect to Shepherd he said: I find that Robert Shepherd was an unreliable witness. In material respects his testimony was self-contradictory—as for instance his testimony in regard to whether he had any obligation to answer call-backs and whether he ever had refused to answer call-backs—on cross-examination many of his answers were equivocal or unresponsive, and in general his answers tended more to defend his position rather than to describe the events as they occurred. I give little credence to Shepherd's uncorroborated testimony.
*Id.* at 3 n.3, app. at 227 n.3.

7. Zipf also recounted specific occasions when Shepherd walked off jobs without doing assigned work. In one instance he refused to attempt emergency repairs and left the premises without explanation. He later explained that the elevator was made by Otis and he worked mainly on Eastern's elevators. When questioned about this incident, Shepherd admitted that his route regularly required him to service elevators not manufactured by Eastern, including one manufactured by Otis. On another occasion, Shepherd reported for work at a building site and left without doing any work because, as he explained, of a safety hazard. That hazard, the testimony revealed, was caused by Shepherd ignoring a safety rule which nearly resulted in serious injury to an electrician on the same job. App. at 142. These and other incidents relating to refusals to do work and performance of substandard work resulted in complaints from Eastern's customers. *See id.* at 139, 141.

his decision. Their testimony was the only evidence that tended to link the intra-union charge with the layoff. The ALJ found that Stephen Zipf's account of the events leading to the termination of Shepherd was credible.

■ It is the long-standing policy of the NLRB to attach great weight to the credibility resolutions of an administrative law judge to the extent they are based on testimonial evidence of live witnesses and the hearing judge has had the opportunity to observe their demeanor. *See, e.g., Standard Dry Wall Products Inc.*, 91 NLRB 544 (1950), *enf'd.*, 188 F.2d 362 (3d Cir. 1951). Accordingly, the Board was required to extend some, but not absolute, deference to the ALJ's determinations that neither Shepherd nor Williams were credible witnesses and that Stephen Zipf was. In overturning the ALJ's factual findings, the Board announced the appropriate legal precepts, but, in our view, failed to accord due weight to the ALJ's findings of fact.

In our review of the Board's order, the statute furnishes our basic direction: the reviewing court treats as conclusive the factual determinations in a Board decision if they are "supported by substantial evidence on the record considered as a whole." 29 U.S.C. § 160(f). That the responsibility of fact finding is placed on the Board and not on the hearing judge, however, does not end our inquiry. The Supreme Court has directed us to recognize that an ALJ's findings of fact constitute a vital part of the whole record that the court must review. These findings "are to be considered along with the consistency and inherent probability of testimony. The significance of his report ... depends largely on the impor-

tance of credibility in the particular case." *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 496, 71 S.Ct. 456, 468, 95 L.Ed. 456 (1951). We must "recognize that evidence supporting a conclusion may be less substantial when an impartial, experienced examiner who has observed the witnesses and lived with the case has drawn conclusions different from the Board's than when he has reached the same conclusion." *Id.*

This court has previously made oblique references to the problem of a disagreement between the ALJ and the Board that centers on credibility of witnesses. For instance in *Edgewood Nursing Center v. NLRB*, 581 F.2d 363, 365 (3d Cir. 1978), we stated that "credibility determinations ... rest with the administrative law judge as long as he considers all the relevant factors . . . ." *See also Altemose Construction Co. v. NLRB*, 514 F.2d 8, 13 (3d Cir. 1975). Beyond these references, this court and the other courts of appeals have not amplified the *Universal Camera* analysis.[8] Nevertheless, "[w]hile the standard set forth in *Universal Camera* is imprecise 'it provides as much clarity as the area affords.'" *NLRB v. Interboro Contractors Inc.*, 388 F.2d 495, 499 (2d Cir. 1967) (quoting *Bon–R Reproductions, Inc. v. NLRB*, 309 F.2d 898, 903 (2d Cir. 1962)).

Judge Wallace of the ninth circuit has observed, however, that these decisions often distinguish credibility determinations based on demeanor, sometimes referred to as testimonial inferences, and inferences drawn from the evidence itself, sometimes referred to as derivative inferences. *Penasquitos Village, Inc. v. NLRB*, 565 F.2d 1074, 1078 (9th Cir. 1977) (Wallace, J., opinion announcing the judgment of the court).[9]

**8.** *See, e. g. NLRB v. Pepsi-Cola Bottling Co. of Topeka, Inc.*, 613 F.2d 267, 271 (10th Cir. 1980); *NLRB v. Jack August Enterprises, Inc.*, 583 F.2d 575, 579 (1st Cir. 1978); *NLRB v. PPG Industries, Inc.*, 579 F.2d 1057, 1058–59 (7th Cir. 1978); *Fruin-Colnon Corp. v. NLRB*, 571 F.2d 1017, 1022 (8th Cir. 1978); *Penasquitos Village, Inc. v. NLRB*, 565 F.2d 1074, 1078 (9th Cir. 1977) (Wallace, J., opinion announcing the judgment of the court); *Abbott Laboratories (Ross Laboratories Division) v. NLRB*, 540 F.2d 662, 667 (4th Cir. 1976); *Retail, Wholesale and Department Store Union, AFL–CIO v. NLRB*, 466 F.2d 380, 386 (D.C.Cir.1972); *Ward v. NLRB*, 462 F.2d 8, 12 (5th Cir. 1972); *NLRB v. Howell Automatic Machine Co.*, 454 F.2d 1077, 1079 (6th Cir. 1972); *NLRB v. Interboro Contractors Inc.*, 388 F.2d 495, 499 (2d Cir. 1967).

**9.** This analysis was suggested by Judge Frank, concurring in *NLRB v. Universal Camera Corp.*, 190 F.2d 429, 432 (2d Cir. 1951), *on remand from* 340 U.S. 474 (1951).

Weight, is given the ALJ's determinations of credibility because he or she "sees the witnesses and hears them testify, while the Board and the reviewing court look only at cold records." *NLRLB v. Walton Manufacturing Co.*, 369 U.S. 404, 408, 82 S.Ct. 853, 855, 7 L.Ed.2d 829 (1962) (per curiam).

In overturning the ALJ's factual findings, the Board emphasized that "it does not appear that the specific credibility resolutions which we are overturning were based on his observation of testimonial demeanor." Board's opinion at 16, app. at 257. We infer from this that the Board made its findings based on the record without that part of Shepherd's or Williams' testimony discredited by the hearing judge. The Board seemed to announce that it was depending on evidentiary inferences that it could properly draw under the *Universal Camera* rule.

We therefore must examine the actual basis for the Board's decision that Eastern's motive in selecting Shepherd for layoff was to retaliate against him because he had filed internal union charges against Carswell. One justification for overturning the ALJ's decision was that he gave no specific reasons for *crediting* the testimony of Stephen and Mark Zipf. The Board, disagreeing with the administrative law judge, found that Stephen and Mark Zipf were aware on the day they selected Shepherd for layoff that he had filed charges against Carswell two months earlier. In so finding, the Board said that it relied not only on the "inconsistent and evasive nature of their testimony," but also on their admissions that they were concerned about the " 'unrest in the troops,' the 'viciousness . . . be-

tween Carswell and Shepherd,' and the 'turbulence within the organization.' " Board op. at 17, app. at 258. In the Board's view, these statements "clearly [referred] to the charges filed by Shepherd against Carswell." *Id.* The Board also relied on the "uncontradicted" testimony of Williams that he informed Stephen and Mark Zipf of the charges at their October, 1978, meeting.

The Board found no evidence supporting Eastern's defense that Robert Shepherd's call-back record or work performance was worse than that of other employees. Absent definitive evidence that Shepherd's record was worse, the Board concluded that Eastern's explanation for retaining five new mechanics instead of an experienced, more senior mechanic was unsatisfactory.

Moreover, the Board found direct evidence of Eastern's motive for laying off Shepherd. They found this "direct evidence" in the testimony of Mark Zipf and Richard Lotter indicating that "turbulence," equated by the Board with the charges, may have been an issue at the meeting at which the decision was made to lay off Shepherd. They placed even greater weight on the opinion of Williams that Stephen Zipf's threat to "get even" referred to Shepherd's charge. The Board then concluded:

> In view of the fact that no reason for Mark Zipf's failure to testify on this subject was offered, and since Stephen and Mark Zipf were the only witnesses who could have refuted Williams' testimony if it were inaccurate, we may infer that the testimony they would have given would

In *Penasquitos Village*, Judge Wallace explained further:

All aspects of the witness's demeanor—including the expression of his countenance, how he sits or stands, whether he is inordinately nervous, his coloration during critical examination, the modulation or pace of his speech and other non-verbal communication—may convince the observing trial judge that the witness is testifying truthfully or falsely. These same very important factors, however, are entirely unavailable to a reader of the transcript, such as the Board or the Court of Appeals.

565 F.2d at 1078–79. Judge Duniway properly observed that these factors cannot be taken as an absolute guarantee of credibility and noted that the "demeanor of a perfectly honest but unsophisticated or timid witness may be—or can be made by an astute cross-examiner to be—such that he will be thought by the jury or the judge to be a liar. He may be unable to face the cross-examiner, the jury or the judge; he may slouch and squirm in the chair; he may be obviously tense and nervous . . . ." *Id.* at 1085 (concurring in part and dissenting in part).

have been unfavorable to Respondent's defense.

*Id.* at 19, app. at 260.

The Board's contrived explanation for substituting its findings for those of the ALJ simply does not survive close analysis. First, there is no policy of the NLRB nor any legal precept requiring a judicial fact finder, a quasi-judicial fact finder, or a lay fact finder, to give reasons for *crediting* the testimony of a witness. It was totally unacceptable for the Board to reject the ALJ's acceptance of the Zipfs' testimony because the ALJ did not give "specific reasons for crediting it." Second, having declared that it would not "overturn" specific credibility resolutions based on the ALJ's "observation of testimonial demeanor," the Board then proceeded to reject the Zipfs' testimony on the basis of the "uncontradicted testimony of Williams," in spite of clear indications that the ALJ discredited Williams on the basis of demeanor. *See* ALJ op. at 4, 6, app. at 228, 230. The Board having disclaimed an intention to rely on testimony discredited by the ALJ, and having then proceeded to do what it expressly denied it was going to do, "[t]he case which irresistibly comes to mind as the most fitting precedent is that of Julia who, according to Byron's reports, 'whispering "I will ne'er consent,"—consented.'" *Everson v. Board of Education,* 330 U.S. 1, 19 (1947) (Jackson, J., dissenting).

The Board's inferred conclusion that the layoff of two men was a pretext for unlawful retaliation against Shepherd cannot be supported by the narrative or historical facts. Williams testified that Mark Zipf allowed him the unfettered option of naming the two mechanics who should be laid off if he did not approve of Eastern's choices. App. at 98. The Board's and the Union's argument that Robert Shepherd or one of the new mechanics could have been transferred to new elevator construction is also unfounded. At the time of the layoff both the maintenance department and the construction departments were being considered for cutbacks. Only one new mechanic was hired after Shepherd was laid off, and he worked only sporadically. App. at 148. Moreover, Eastern had no obligation to transfer and retrain an unreliable employee for work that might better suit his personal work habits and schedule preferences. These facts and the uncontradicted and credited evidence of Eastern's officers explaining why Shepherd was laid off, set forth in detail in part II, *supra,* constitute the historical or narrative facts on this issue. From these facts, the Board is permitted to draw only reasonable inferences.

Finally, the Board cannot rest its case merely on the inference that Stephen Zipf knew of the intra-union charges in September, 1978, because of his references to "unrest in the troops" and animosity between Shepherd and Carswell. The record discloses that Zipf knew as early as November, 1977, that Shepherd and Carswell were involved in a personal dispute. App. at 229. The filing of charges was simply one in a series of events causing hostilities between these two employees. The General Counsel's burden was to prove not only that Eastern knew of the charges but that Shepherd's charge motivated the discharge. *See NLRB v. Eagle Material Handling, Inc.,* 558 F.2d 160, 169 (3d Cir. 1977). In the absence of this link, the case fails.

We recognize that direct evidence of this causal relationship will rarely be available and therefore the Board will ordinarily rely on inferences drawn from circumstantial evidence. Although the Board is permitted to draw permissible inferences from narrative or historical facts, the evidence must do more than create a suspicion of the inferred facts. We have recently emphasized that "[a] legitimate or permissible inference must be deduced as a logical consequence of facts presented in evidence.... There must be a logical and rational connection between the basic facts presented in evidence and the ultimate fact to be inferred." *EEOC v. Greyhound Lines, Inc.,* 635 F.2d 188, 194 (3d Cir. 1980) (citation omitted); *cf. Edward J. Sweeney & Sons, Inc. v. Texaco, Inc.,* 657 F.2d 105, 111, 115——, —————, No. 79–2468 (3d Cir. 117 (3d Cir. 1980) (failure to establish causal relation between acts of antitrust defend-

ant and alleged co-conspirators justifies entry of directed verdict).

■ Upon reviewing the record, we conclude that the evidence supporting the Board's finding that Shepherd's intra-union charge motivated Eastern to lay him off was insubstantial. The only facts tending to show this link were the numerous references to "unrest in the troops" and indications that the tension among Shepherd, Carswell, and Stephen Zipf entered into the decision. The Board ignored the common knowledge in the company that for almost a year before Shepherd filed his complaint Shepherd and Carswell were feuding. Union business manager Williams revealed that he discussed with Zipf Shepherd's unsatisfactory work performance a year before his layoff. Moreover, the layoff occurred two months after the charge. These two facts strongly negate an inference drawn from the timing of the layoff that the charge motivated the decision to lay off Shepherd and tend to support Eastern's assertion of a legitimate interest in having an efficient, harmonious work force. Discounting the weight of these facts accordingly, the only evidence remaining in support of the Board's position is the discredited recollection of Williams that Stephen Zipf vowed to "get even" with Shepherd.[10]

Countering this evidence were Stephen Zipf's specific denials of the incriminating statements attributed to him, and denials by both Zipfs that the charges were considered in the decision to lay off Shepherd. The ALJ credited this testimony. More important, Eastern demonstrated non-pretextual legitimate reasons for letting Shepherd go. The record clearly shows that he was a volatile and unpredictable employee who offended both management and customers. In addition, his work was shown to be unsatisfactory and his call-back record in particular burdened the company and fellow employees and threatened the using public. Stripped of its factual underpinnings, then, the Board's conclusion that Robert Shepherd was laid off because of union activities in violation of Section 8(a)(1) and (3) of the Act simply is unsupported by substantial evidence.

## IV.

Based on our review of the record as a whole, giving due weight to the credibility resolutions of an experienced and impartial administrative law judge, we conclude that the Board's findings are not supported by substantial evidence. The petition for review will be granted and the application for enforcement will be denied.[11]

---

**10.** We specifically reject the inferences the Board drew from the testimony of maintenance supervisor Freeman Lotter, who was present when the decision to lay off Shepherd was made. Lotter testified that he had just begun working for Eastern at that time and he was unfamiliar with Shepherd or his work, app. at 195–96. His testimony was of little consequence.

We also reject the inferences the Board extracted from Eastern's failure to document its need to lay off two mechanics. Uncontradicted testimony established that Eastern had warned union business agent Williams before the administration of the mechanics' examination that it would be unable to absorb many new mechanics. In addition to this forewarning, Eastern also showed that it did not replace the laid-off employees. These two facts more than offset the Board's determination that Eastern was required to present documentary evidence to establish this point.

**11.** In the view we take, it is unnecessary to consider other contentions presented by the parties.