**UNITED OIL MANUFACTURING CO., INC., Petitioner,**

v.

**NATIONAL LABOR RELATIONS BOARD, Respondent.**

No. 81–1478.

United States Court of Appeals, Third Circuit.

Argued Oct. 27, 1981.

Decided Feb. 22, 1982.

Rehearing and Rehearing En Banc Denied May 17, 1982.

Richard H. Zamboldi (argued), Richard W. Perhacs, Elderkin, Martin, Kelly, Messina & Zamboldi, Erie, Pa., for petitioner.

David A. Fleischer (argued), William A. Lubbers, Gen. Counsel, John E. Higgins, Jr., Deputy Gen. Counsel, Robert E. Allen, Acting Associate Gen. Counsel, Elliott Moore, Deputy Associate Gen. Counsel, N. L. R. B., Washington, D. C., for respondent.

Before ADAMS, VAN DUSEN and SLOVITER, Circuit Judges.

## OPINION OF THE COURT

SLOVITER, Circuit Judge.

This case is before us on the petition of United Oil Manufacturing Co. (United Oil) for review of an order of the National Labor Relations Board (Board) directing it to cease and desist from the commission of certain unfair labor practices, restore past pay and benefits to certain employees, and recognize and bargain with the Union, and on the cross-application of the Board for enforcement of its order. United Oil challenges that portion of the order establishing a bargaining order remedy. For the reasons discussed below, we will deny the petition for review and grant the Board's cross-application for enforcement of its order.

I.

United Oil operates a vehicle service complex on Interstate 80 in Kylertown, Pennsylvania, known as "Stop 21", consisting of a gasoline and diesel fuel station, a store, and a motel. In the same complex, but operated by independent lessees of United Oil's parent corporation, are a restaurant, barber shop, and truck repair facility.

In late October 1979, one of United Oil's employees, Julio Leid, contacted Amalgamated Food Employees Union Local 590, United Food and Commercial Workers International Union, AFL–CIO (Union), and arranged for an organizational meeting to be held at her home on the afternoon of October 28. Five employees attended the meeting with a union organizer and signed union authorization cards. By some time in early November, the Union had obtained signed authorization cards from 17 of the 29 employees in the unit. On November 3, November 5, and again on November 11, the Union sought recognition by the company. In response to the last of these requests, General Manager Cecil Felix declined to confer recognition and responded that he wanted a fair election. In the interval between the arrangements for the organizational meeting and the request for recognition, the company had engaged in conduct which formed the basis for some of the underlying unfair labor practice charges, including unlawful interrogation and the grant of wage increases and promotions for the purpose of discouraging union

activity. The union representative told Felix that the company's conduct had made a fair election impossible, and convened a meeting of employees at which a decision to strike was adopted on account of the company's refusal to bargain and its alleged unfair labor practices in connection with the organizational campaign. The strike, which appears to have been completely effective, lasted from November 12, 1979 until March 10, 1980, when the employees were reinstated following their unconditional offer to return to work.

The Administrative Law Judge found that United Oil had committed three separate unfair labor practices. First, he found that the company, through General Manager Felix, had interrogated employee Eugene Zahuranec concerning the initial organizational meeting at Julio Leid's home on October 28 and had improperly instructed him to report on what transpired at the meeting. Before the meeting, Zahuranec had requested Felix for time off to attend the meeting. Felix asked who else would be in attendance and "opined that the Union was no good." Felix "told Zahuranec to go to the meeting and to call him at the conclusion thereof to report what had happened." The next morning Felix phoned Zahuranec and asked who had been at the meeting, what had transpired, and the identity of the instigator of the union activity. Zahuranec identified the participants and indicated that he believed that Julio Leid had initially contacted the Union. Based on Zahuranec's testimony, which the ALJ credited, the ALJ found that United Oil violated section 8(a)(1) of the National Labor Relations Act by "Felix questioning [Zahuranec] concerning union activity of co-workers, by instructing Zahuranec to report on the union activity of co-workers, and by his broad questioning of Zahuranec as to what transpired at the union meeting of October 28."

The second unfair labor practice found by the ALJ was based on evidence that following its knowledge of the Union's organizational effort, the company granted promotions and small wage increases to five employees, including Julio Leid and one other employee who had attended the October 28 meeting. Leid was first contacted by Felix about the promotion on October 29; the official notification of all five promotions

and wage increases came on November 3 in the form of an announcement signed by Felix which was included with employee paychecks. The ALJ noted that United Oil's "evidence includes no explanation for this sudden upgrading of the . . . employees and the grant of an increase, shortly after acquisition of knowledge that a union campaign was in progress." The ALJ found that United Oil violated section 8(a)(1) "by promising wage increases and promotions, and by granting same, for the purposes of discouraging union activity."

The third unfair labor practice related to the company's post-strike conduct. The ALJ credited the testimony of three reinstated strikers, including Leid and Zahuranec, that they were not accorded the same opportunity to earn overtime pay which they had enjoyed prior to the strike. The ALJ found that the failure to restore to the strikers the overtime benefits previously enjoyed was not justified by supervening economic considerations and, accordingly, violated sections 8(a)(3) and (1) of the Act.

Two additional unfair labor practice charges, involving alleged surveillance by Felix of the October 28 meeting and the discharge of an employee, were dismissed by the ALJ.

The ALJ ordered United Oil to cease and desist from the commission of the unfair labor practices found to have occurred, restore the overtime benefits enjoyed by the three employees prior to the strike, and post appropriate notices. The ALJ characterized the granting of the promotions and wage increases as "serious unfair labor practices." He acknowledged that whether a bargaining order was warranted was not "free from doubt," but rejected the request for a bargaining order ·on the ground that conventional remedies were adequate in this case to facilitate a fair election. Among the considerations referred to by the ALJ were that, with the exception of the denial of overtime benefits to the reinstated strikers, the company's unlawful conduct occurred prior to the first demand for recognition by the Union on November 3, and that the unlawful interrogation of Zahuranec occurred only after Zahuranec had initially volunteered information about the union activity of his fellow employees.

The Board adopted the ALJ's findings as to the commission of the unfair labor prac-

tices,[1] but modified the ALJ's order insofar as it concerned the necessity of a bargaining order. The Board found that the company had violated section 8(a)(5) of the Act and that the unfair labor practices committed were sufficiently serious to warrant a bargaining order.

United Oil challenges only that portion of the Board's decision which found a section 8(a)(5) violation and issued a bargaining order remedy.

## II.

As in all cases where a bargaining order is at issue, we start with the Supreme Court's decision in *NLRB v. Gissel Packing Co.*, 395 U.S. 575, 89 S.Ct. 1918, 23 L.Ed.2d 547 (1969). In our recent en banc opinion in *Hedstrom Co. v. NLRB*, 629 F.2d 305 (3d Cir. 1980), *cert. denied*, 450 U.S. 996, 101 S.Ct. 1699, 68 L.Ed.2d 196 (1981), we summarized the teaching of *Gissel* as follows:

In *Gissel*, the Court declared that a bargaining order may appropriately be imposed in place of a new election not only in cases involving outrageous conduct [so-called *Gissel* I cases], but also in other than extraordinary cases that are "marked by less pervasive practices which nonetheless still have the tendency to undermine majority strength and impede the election processes" [so-called *Gissel* II cases]. The Board's authority to issue a bargaining order on a lesser showing of employer misconduct is appropriate when there is also a showing that at one point the union had the support of a majority of employees. In such a case, a bargaining order serves both to effectuate ascertained employee free choice and to deter employer misconduct.

*Id.* at 308 (citations omitted).

■ Critics of bargaining orders stress the truism that free elections are the preferred method of selecting bargaining representatives, but the Supreme Court has approved the power of the Board to issue bargaining orders in appropriate cases and

we are obliged to defer to that judgment. In some situations, Board-ordered bargaining may be the only way in which employee choice can be effectuated. Although it may appear to us that the Board is sometimes too readily inclined to impose a bargaining order, which undesirably "insulates a union from the hazards of an election, and arguably tilts the scale too far in the union's favor," *NLRB v. K & K Gourmet Meats, Inc.*, 640 F.2d 460, 473 (3d Cir. 1981) (Gibbons, J., dissenting), the propriety of the choice of a bargaining order in a given case has been left to the Board. As the Court stated in *Gissel* :

It is for the Board and not the courts . . . to make that determination, based on its expert estimate as to the effects on the election process of unfair labor practices of varying intensity. In fashioning its remedies under the broad provisions of § 10(c) of the Act . . . the Board draws on a fund of knowledge and expertise all its own, and its choice of remedy must therefore be given special respect by reviewing courts. "[I]t is usually better to minimize the opportunity for reviewing courts to substitute their discretion for that of the agency."

395 U.S. at 612 n.32, 89 S.Ct. at 1939 n.32 (citations omitted). With the limited scope of our review thus in mind, we turn to an examination of the Board's choice of remedy in this case.

■ It does not seem to be disputed that this is a *Gissel* II-type case, or that the threshold requirement of a showing of union majority status has been satisfied. Nor does United Oil contest that it committed the 8(a)(1) and 8(a)(3) violations found by the Board. The crucial question before us is therefore whether the unfair labor practices which concededly occurred in this case were sufficient, in their extent and effect, to support the Board's choice of a bargaining order remedy.

The Board gave the following statement of the basis for its order:

---

1. The Board found that the unlawful promotions and wage increases had been extended to a sixth employee.

The commission of such serious unfair labor practices enumerated above, in a unit as small as the unit involved herein, makes a fair election doubtful, if not impossible. By its actions, Respondent clearly demonstrated to. the employees that it alone controlled their economic destiny. After ascertaining the identity of the principal union supporters, Respondent sought to "buy them off" with rewards and promotions. When that failed, Respondent took the reverse tack and punished them by denying overtime hours and pay. The message to the employees was that Respondent had the economic means at its disposal to achieve the result it desired. Such a powerful message cannot be erased or forgotten. Therefore, under these circumstances, the use of traditional remedies will not suffice. Accordingly, we conclude that a bargaining order would best protect employee sentiment already expressed through authorization cards.

United Oil's primary argument is that its unlawful conduct was minor and that there was no evidence that it tended to undermine the Union's majority. It emphasizes that the interrogation of Zahuranec and the grant of promotions and wage increases occurred prior to the Union's attainment of majority status, and that the targets of the unlawful conduct continued to support the Union even after its occurrence. This argument fails to respond to the significant finding that even after the strike, its unlawful post-strike conduct continued to send "a powerful message." The denial of overtime benefits occurred after both the attainment of union majority status and the manifestation of union support through the strike. The post-strike violations are important not only on their own account but also because of the reinforcing effect which they may have had on the pre-strike violations. In *NLRB v. Permanent Label Corp.*, 657 F.2d 512, 519 (3d Cir. 1981) (en banc), we rejected the contention that unfair labor practices which occur before the achievement of union majority could not be relied upon by the Board in issuing a bargaining order, since "[f]orbidding the Board from considering such conduct sets an artificial time barrier and ignores the possible cumulative effect of antiunion activity."

In *Electrical Products Division of Midland-Ross Corp. v. NLRB*, 617 F.2d 977 (3d Cir.), *cert. denied*, 449 U.S. 871, 101 S.Ct. 210, 66 L.Ed.2d 91 (1980), we identified the elements which we have often considered in determining whether a given bargaining order is proper. One was whether the objectionable conduct "was communicated to a 'significant percentage of employees in the bargaining unit.'" *Id.* at 987. In this case, seven out of the 29 employees in the unit were directly affected by the illegal conduct, either as the targets of interrogation, the recipients of promotions and wage increases, or the victims of denied overtime benefits. The wage increases and promotions were communicated in writing by the employer to other employees. A change in the union vote of only three employees would have destroyed the union's majority.

The second element referred to in *Midland-Ross* was whether "the unfair labor practices involved senior company officials." *Id.* Here, the central figure in the unlawful conduct charged to Union Oil was General Manager Felix, the most senior company official at Stop 21.

The final *Midland-Ross* factor was whether the unfair labor practices created "a psychological impact on all the employees that is unlikely to dissipate." *Id.* The unfair labor practices in this case may not have the same psychological impact as the threats of plant closure involved in *Midland-Ross*, but we cannot say that the Board overstepped the limits of the discretion vested in it by *Gissel* when it concluded that United Oil's conduct conveyed "a powerful message [which] cannot be erased or forgotten." [2]

---

**2.** In *Hedstrom Co. v. NLRB*, 629 F.2d at 312, we listed a fourth factor, which does not seem to be present in this case: whether "the employer has demonstrated a history of opposition to unionization."

United Oil contends that our review in this case should be governed by the decision in *NLRB v. K & K Gourmet Meats, Inc.,* 640 F.2d 460 (3d Cir. 1981), where we refused to enforce a bargaining order. On the surface, there is some resemblance between the two cases. *K & K Gourmet Meats* involved the same union and union organizer, similar charges of unlawful interrogation and promises of benefits, and a strike during the organizational campaign. Moreover, in *K & K Gourmet Meats,* as in this case, the Board overruled the ALJ in imposing a bargaining order.

A careful examination shows significant differences between *K & K Gourmet Meats* and this case.[3] In *K & K Gourmet Meats,* the ALJ had characterized the violations of the Act as "minimal", 640 F.2d at 468; in this case the ALJ described the promotions and wage increases as "serious unfair labor practices." In *K & K Gourmet Meats,* we determined that only two of the five unfair labor practices upon which the Board had based its bargaining order were supported by the record; in this case the violations are conceded. The company relies on the statement in *K & K Gourmet Meats* where the court pointed to the strike which followed the commission of the unfair labor practices as providing an indication that the unlawful conduct had had little impact on union support. However, in that case there were no post-strike violations. Here, the company engaged in unfair labor practices after the strike and that conduct was directed at one of the leading union supporters, among others. The Board found that post-strike conduct contributed to the effect of "clearly demonstrat[ing] to the employees that

[United Oil] alone controlled their economic destiny." Finally, if the holding in *K & K Gourmet Meats* suggested some hostility on the part of this court to bargaining orders, then any such impression should have been dispelled by our subsequent en banc decision in *NLRB v. Permanent Label Corp.,* 657 F.2d 512 (3d Cir. 1981), where a bargaining order was enforced.

The Supreme Court has recently reaffirmed that the judiciary should not substitute its judgment for that of the Board "with respect to the issues that Congress intended the Board should resolve." *Charles D. Bonanno Linen Service, Inc. v. NLRB,* —— U.S. ——, ——, 102 S.Ct. 720, 727, 70 L.Ed.2d 656 (1982). The binding precedent of *Gissel* teaches that the choice of remedy for unfair labor practices is an issue vested in the discretion of the Board. We do not suggest that the courts do not have an important review function to perform, but that we must be mindful of its proper scope. It is not relevant whether we would have reached the same conclusion as the Board; it is "not our function to substitute our judgment for the Board's on the propriety of a bargaining order." *NLRB v. Armcor Industries, Inc.,* 535 F.2d 239, 245 (3d Cir. 1976). In this case, we cannot conclude that the Board overstepped the authority of *Gissel* in reaching its conclusion that the cumulative effect of the unfair labor practices made "the possibility of erasing the effects of past practices and of ensuring a fair election ... by the use of traditional remedies, though present, ... slight." *Gissel,* 395 U.S. at 614, 89 S.Ct. at 1940.[4]

**3.** Similarly, the other cases cited by United Oil fail to support its position that the bargaining order here was improper. *NLRB v. Armcor Industries, Inc.,* 535 F.2d 239 (3d Cir. 1976) and *Hedstrom Co. v. NLRB,* 558 F.2d 1137 (3d Cir. 1977), both turned not on the merits of the bargaining order but on the Board's failure to articulate the basis for its decision. Indeed, when the Board on remand in *Hedstrom* stated its reasons and again imposed a bargaining order, this court enforced the order. *Hedstrom v. NLRB,* 629 F.2d 305 (3d Cir. 1980) (en banc), *cert. denied,* 450 U.S. 996, 101 S.Ct. 1699, 68 L.Ed.2d 196 (1981). In *Struthers-Dunn, Inc. v.*

*NLRB,* 574 F.2d 796 (3d Cir. 1978), the record showed that the union had lost its majority before the commencement of any unfair labor practice. Finally, in *Rapid Manufacturing Co. v. NLRB,* 612 F.2d 144 (3d Cir. 1979), the evidence demonstrated that the unlawful conduct had neither involved senior company officials nor affected a significant percentage of the employees.

**4.** The Board adopted all of the ALJ's relevant factual findings, and differed only as to the need for a bargaining order. Therefore, the case to which the dissent refers, *Eastern Engineering and Elevator Co. v. NLRB,* 637 F.2d 191

### III.

United Oil raises two additional arguments for denying enforcement. On December 7, 1979, the Union had filed a representation petition with the Board, seeking a unit which included all of United Oil's full-time and regular part-time employees at Stop 21, as well as the employees of the leased restaurant; or in the alternative, a unit which excluded all of the employees of the leased operations and in addition excluded the employees of the motel operated by United Oil. In a decision dated January 29, 1980, the Regional Director rejected both units proposed by the Union, and directed an election in a unit comprising all of United Oil's full-time and regular part-time employees at Stop 21, including the motel employees, and excluding the employees of the leased restaurant. United Oil contends that because the unit sought by the Union in its representation petition was found by the Regional Director to be inappropriate the Board erred in finding a section 8(a)(5) violation. However, the ALJ found that at the time United Oil rejected the Union's demand for recognition, it had no knowledge of the inappropriateness of the unit sought. The ALJ found that the Union's demand for recognition had described an appropriate unit consisting of "[a]ll full-time and part-time employees employed by United Oil Corporation at your Kylertown Truck Stop 21, Clearfield County[,] [e]xcluding: all other employees and guards, professional employees and supervisors as defined in the Act." It is therefore immaterial that the subsequent representation petition described the unit differently.

The company's other argument is that the General Counsel's complaint alleged only that the Union enjoyed majority status from October 28, 1979 until November 3, 1979 (when the Union first demanded recognition), and that no allegation was made that the majority status continued until November 11, the date of the Union's final demand for recognition and its rejection by

(3d Cir. 1980), in which the Board had overruled the ALJ's credibility determination, is in-

United Oil. However, the company does not contend that the Union did not maintain its majority through at least November 11; indeed it is the maintenance of that majority on which the company relied in challenging the need for a bargaining order. We find that the record in this case supports the Board's conclusion that the Union had majority status at the relevant times.

For the foregoing reasons, we will deny United Oil's petition for review, and enforce the order of the Board.

ADAMS, Circuit Judge, concurring.

 In a number of important respects, I agree with the sentiments expressed in Judge Van Dusen's dissenting opinion. For example, I subscribe to the view that "a fundamental tenet of the national labor policy is that a Board-supervised, secret ballot election is 'the preferred method of selecting bargaining representatives.'" Dissenting opinion at 3. Similarly, I believe that a "bargaining order is an extraordinary remedy . . . [and] is appropriate only when the harmful effects of [the] disenfranchisement [of workers] are outweighed by the positive advancement of the policies underlying federal labor law." *Id.* at 1210 (quoting *NLRB v. K & K Gourmet Meats, Inc.,* 640 F.2d 460, 470 (3d Cir. 1981)). Finally, I am in accord with the position that one responsibility of a court of appeals charged with reviewing bargaining orders issued by the NLRB is to "draw[ ] the line at what it believes to be the point where the factual similarity between the present case and [*NLRB v. Gissel Packing Co.,* 395 U.S. 575, 89 S.Ct. 1918, 23 L.Ed.2d 547 (1969)] is so tenuous, and the danger to employee free choice so strong, that applying the rule of [*Gissel*] is not justifiable." Dissenting opinion at 5. To do less, it seems to me, would be to adopt a "toothless" standard of review and to ignore our statutorily-imposed obligation to ensure that administrative bodies proceed rationally, fairly, and legally.

apposite.

Unlike the dissent, however, I do not believe that we are justified in "drawing the *Gissel* line" so as to prevent the Board from imposing a bargaining order to remedy the unfair labor practices that were found to exist in this proceeding. There are three reasons for reaching this conclusion. First, I am persuaded that virtually all of the elements deemed significant by our previous cases in determining whether a bargaining order should have been issued were present in the record here. *See, e.g., Hedstrom Co. v. NLRB,* 629 F.2d 305, 312 (3d Cir. 1980) (in banc), *cert. denied,* 450 U.S. 996, 101 S.Ct. 1699, 68 L.Ed.2d 196 (1981); *Electrical Products Division of Midland-Ross Corp. v. NLRB,* 617 F.2d 977, 987 (3d Cir.), *cert. denied,* 449 U.S. 871, 101 S.Ct. 210, 66 L.Ed.2d 91 (1980). Second, I am convinced that this dispute is not on all fours with *K & K Gourmet Meats, supra,* which represents the limiting case with respect to the power of the Board in this regard. In my view, the dissent unjustifiably dismisses the Board's explicit finding that the presence of post-strike violations on the part of United Oil contributed significantly to an atmosphere that, in the Board's expert evaluation, could not be addressed by a more traditional remedy.[1] Finally, precisely because whether there are enough facts in the record to justify a bargaining order may be viewed as a close issue, it is appropriate to recognize what the Supreme Court has declared, namely, that in matters of this type, "the Board draws on a fund of knowledge and expertise all its own" and thus deserves to be accorded "special respect" as to its "choice of remedy." *Gissel, supra,* 395 U.S. at 612

n.32, 89 S.Ct. at 1939 n.32, *see also Universal Camera Corp. v. NLRB,* 340 U.S. 474, 71 S.Ct. 456, 95 L.Ed. 456 (1951).

In sum, despite my identification with many of the principles advanced in the dissenting opinion, I cannot conclude, after reviewing the record in this case, that the Board erred as a matter of law in imposing a bargaining order, given the "exceptional" circumstances involved here. Similarly, I cannot conclude that the Board somehow abused its discretion in determining that United's "serious unfair labor practices . . . ma[de] a fair election doubtful, if not impossible" and that "the use of traditional remedies [would] not suffice." Appendix at 50–51. Accordingly, while recognizing the question to be extremely close, I concur.

VAN DUSEN, Senior Circuit Judge, dissenting:

As a reading of our opinions shows, this is not the first time in recent years that this court has struggled with the difficult issues raised by the National Labor Relations Board's issuance of an order to bargain as an unfair labor practice remedy. *See NLRB v. Permanent Label Corp.,* 657 F.2d 512 (3d Cir. 1981) (en banc); *NLRB v. K & K Gourmet Meats, Inc.,* 640 F.2d 460 (3d Cir. 1981); *Hedstrom Co. v. NLRB,* 629 F.2d 305 (3d Cir. 1980) (en banc), *cert. denied,* 450 U.S. 996, 101 S.Ct. 1699, 68 L.Ed.2d 196 (1981).[1] I doubt that it will be the last. These cases, which seek to develop a consistently applicable standard of review of these orders, reflect the tremendous difficulty inherent in balancing the court's

---

1. The dissent suggests that legal effect be given to the ALJ's decision not to impose a bargaining order despite the presence of post-strike violations because such a decision, "if not solely [a] question[ ] of fact, at the very least [is] uniquely suited to determination by the ALJ." Dissenting opinion at 7 n.2. However, the primary authority cited by the dissent, *Eastern Eng'r & Elevator Co. v. NLRB,* 637 F.2d 191, 197 (3d Cir. 1980) (emphasis added), stands only for the proposition that "great weight" should be attached to "the *credibility* resolutions of an administrative law judge"—a proposition with which I agree, as apparently does Judge Sloviter. The Board's

conclusion in this proceeding that a bargaining order is necessary simply represents the Board's application of the law to facts adduced by the ALJ, and consequently neither overturns a "credibility determination" of an ALJ nor undermines that official's essential fact-finding function.

1. For a general discussion of the history of bargaining order enforcement in this circuit prior to these most recent cases, *see* Comment, *Enforcement of Collective Bargaining Orders in the Third Circuit: The Rise and Fall of the Armcor Standards,* 25 Vill.L.Rev. 913 (1980).

limited role in reviewing administrative action with its constitutional responsibility to constrain such agencies within the broad policies established for them by Congress. As is evidenced by the abovementioned two recent en banc decisions, the development and articulation of this standard is a matter of great concern to the active judges in which I do not presume to interfere. My concern here is with the result reached on the facts of this case. While the able and articulate majority opinion clearly sets forth the standard of review and applies it to a statement of facts with which I take no substantial exception, the result is to countenance a departure from the principles of the Act and the teaching of the Supreme Court that is so fundamental that I must respectfully dissent.

## I.

I agree entirely with the majority opinion when it states that "[a]s in all cases where a bargaining order is at issue, we start with the Supreme Court's decision in *NLRB v. Gissel Packing Co.*, 395 U.S. 575, 89 S.Ct. 1918, 23 L.Ed.2d 547 (1969)." *See* Majority at 1211. A close reading of *Gissel*, I believe, will crystallize the point of my disagreement with the result in this case. Before *Gissel,* a bargaining order could issue only "in 'exceptional' cases marked by 'outrageous' and 'pervasive' unfair labor practices [of] 'such a nature that their coercive effects cannot be eliminated by the application of traditional remedies.' " 395 U.S. at 613–14, 89 S.Ct. at 1939–40, *quoting NLRB v. Logan Packing Co.*, 386 F.2d 562, 570 (4th Cir. 1967). These are now called "*Gissel* I" orders. In *Gissel* itself, the United States Court of Appeals for the Fourth Circuit, relying on its own *Logan Packing* decision, took the position that this was the only situation in which a bargaining order was proper. *See* 395 U.S. at 611–13, 89 S.Ct. at 1938–39. In reversing, the Supreme Court recognized the continuing validity of the *Gissel* I orders, noted that "the actual area of disagreement between our position here and that of the Fourth Circuit *is not large as a practical matter*," *id.* at 613, 89 S.Ct. at 1939 (emphasis added), and explained:

"The only effect of our holding here is to approve the Board's use of the bargaining order in less extraordinary cases marked by less pervasive practices which nonetheless still have the tendency to undermine majority strength and impede the election processes. The Board's authority to issue such an order on a lesser showing of employer misconduct is appropriate, we should reemphasize, where there is also a showing that at one point the union had a majority; in such a case, of course, effectuating ascertainable employee free choice becomes as important a goal as deterring employer misbehavior. In fashioning a remedy in the exercise of its discretion, then, the Board can properly take into consideration the extensiveness of an employer's unfair practices in terms of their past effect on election conditions and the likelihood of their recurrence in the future. If the Board finds that the possibility of erasing the effects of past practices and of ensuring a fair election (or a fair rerun) by the use of traditional remedies, though present, is slight and that employee sentiment once expressed through cards would, on balance, be better protected by a bargaining order, then such an order should issue . . . ."

*Id.* at 614–15, 89 S.Ct. at 1940–41. These orders, now called "*Gissel* II" orders, may thus be utilized by the Board, when it deems them necessary and appropriate, in less extraordinary cases than *Gissel* I orders. In my opinion, however, it is nothing less than a perversion of the Supreme Court's language to suggest, as the Board does in this case (Br. at 21 n.15), that a *Gissel* II order is not an extraordinary remedy. To say that a situation which justifies its use is "less extraordinary" than "outrageous and pervasive" by no means implies that a *Gissel* II order is not an extraordinary remedy which should be used only when the chance of success with a traditional remedy is "slight." As noted above, the Supreme Court in *Gissel* explicitly stated that its disagreement with the Fourth Cir-

cuit—and thus the difference between a *Gissel* I and *Gissel* II order—"is not large as a practical matter." 395 U.S. at 613, 89 S.Ct. at 1939.

 The reason for this is quite straightforward. Although the majority opinion dismisses it as a "truism" (at 1211), I believe it is clear that a fundamental tenet of the national labor policy is that a Board-supervised, secret ballot election is "the preferred method of selecting bargaining representatives." The relationship between this fundamental tenet and the Supreme Court's recognition of the validity of a bargaining order in some situations was recently explained at length by Judge Rosenn in his majority opinion in *NLRB v. K & K Gourmet Meats, Inc., supra,* and I cannot improve on his articulation of it:

"The selection of an exclusive collective bargaining agent is not a game of chance but a matter of the highest importance to employees and employers alike. Legislation and experience indicate that an employee's statutory right to select an exclusive bargaining agent should be determined by democratic process in a free and open election. The Board's responsibility for holding such elections was not meant to be supplanted by the authority found to exist in Gissel. Only in exceptional circumstances, where it is obvious that the extensive machinery and power of the NLRB is inadequate to ensure a free election, should employees be denied their right to cast a secret ballot for or against an exclusive bargaining agent.[4] . . . . The bargaining order is an extraordinary remedy and, because it operates to disenfranchise the workers in the choice of their representative, it is appropriate only when the harmful effects of that disenfranchisement are outweighed by the positive advancement of the policies underlying federal labor law.

---

"[4] The dissent submits that against the concern for employers and employees subject to bargaining orders must be weighed 'the strong federal policy in favor of the formation of collective bargaining relationships.' (Dissenting op., infra at 474.) On the contrary, we believe that the federal policy with respect to the formation of collective bargaining relation-

ships is neutral. We view the thrust of federal policy as the protection 'of the right of employees to organize and bargain collectively' when they are so inclined. *See* 29 U.S.C. § 151 (1976). *See also* 29 U.S.C. § 157 (1976). Therefore, Congress in its declaration of national policy encouraging collective bargaining has also stated its policy in 'protecting the exercise of workers of full freedom of association, self-organization and designation of representatives of their own choosing.' 29 U.S.C. § 151. Freedom of association and free selection of a bargaining agent, however, may be substantially diminished by dependence on authorization cards.

"Cards have inherent uncertainties and risks attached to them. Even when the language is clear and unambiguous, the union solicitor may inform the signer that the card will be used only to obtain an election or merely to show interest in an election and that the language above the signature should be disregarded. *NLRB v. Boyer Bros., Inc.,* 448 F.2d 555 (3d Cir. 1971). It may be accompanied by representations that it is not a final designation until there is an election. *See Amalgamated Clothing Workers v. NLRB,* 365 F.2d 898, 906–08 (D.C.Cir.1966). There may also be misrepresentations, *e.g.,* that a majority of the employees have signed authorization cards when in fact they have not. *See NLRB v. Savair Mfg. Co.,* 414 U.S. 270, 277, 94 S.Ct. 495, 498, 38 L.Ed.2d 495 (1973). The solicitations may also be attended by coercion or threats of reprisals and the employee's signature may not be the free and informed decision made in the privacy of a voting booth. *See Texaco, Inc. v. NLRB,* 436 F.2d 520, 524 (7th Cir. 1971). The Court in *Gissel* recognized that cards are 'admittedly inferior to the election process,' although they may perhaps be the only way of assuring employee choice when the employer engages in conduct disruptive of the election process. 395 U.S. at 602–03, 89 S.Ct. at 1934. As we note in the text, there is nothing in the record here to indicate that the Board could not conduct a fair election at the K & K plant."

640 F.2d at 469–70 & n.4. I believe, as did Judge Rosenn, that

"In this case, and too often in others, the Board has looked upon a bargaining order as a convenient remedy for minor violations when traditional remedies could be equally effective and still preserve for employees their statutory right to select their exclusive bargaining agent by a democratic process in an open election."

*Id.* at 468 n.3. Where, as here, the facts bear no resemblance whatever to those of *Gissel* itself and where it appears that the

Board is using a bargaining order for a purpose never intended, it is not a matter of this court substituting its judgment for the expertise of the Board or of saying that we would have decided differently in the first instance. Neither is it a question of what we will require of the Board by way of a statement of reasons or other procedural guarantees, such as concerned the court in *Hedstrom* and *Permanent Label*. Rather, it is this court drawing the line at what it believes to be the point where the factual similarity between the present case and *Gissel* is so tenuous, and the danger to employee free choice so strong, that applying the rule of that case is not justifiable. I would draw that line here.

## II.

I must respectfully disagree with the majority's proffered factual distinctions between this case and *K & K Gourmet Meats* (*see* majority op. at 1213). First, the majority correctly observed that the ALJ in *K & K Gourmet Meats* found the unfair labor practices there to be "minimal" while the ALJ here found the promotions and wage increases to be "serious." Be that as it may, the law is not that a *Gissel* order is appropriate given "serious" unfair labor practices, but rather that an order may issue upon a finding that the possibility that a fair election may be had with traditional remedies is slight. It was this precise finding which the ALJ refused to make after having observed the live testimony of the employee witnesses and making a firsthand evaluation of the workplace atmosphere. Thus, whatever, the ALJ may have meant by the term "serious," he clearly did not mean "sufficient to warrant a bargaining order." To then use the ALJ's subjective language to support a conclusion he himself refused to reach seems to me to be rather anomalous.

Next, the majority notes that the court upheld only two of the Board's five unfair labor practice findings in *K & K* while the

unfair labor practices were conceded here. This is true but, I submit, not compelling for it is not the number of unfair labor practices but their effect which is the test. To presume such effect is, in Judge Rosenn's words, "the grossest kind of speculation." 640 F.2d at 469.

Finally, it is also true that this case involved a post-strike unfair labor practice, while all of the misconduct in *K & K Gourmet Meats* took place before the strike. Although this is a potentially relevant factual distinction between the cases, I do not believe it to be of substantial significance. The majority appears to accept for purposes of argument, as I will, the employer's argument that, as in *K & K*, the total success of the strike is an indication that the pre-strike unfair labor practices were not sufficient to undermine the union's majority (majority op. at 1213). They then rely on the post-strike actions here to distinguish the case. Thus, the validity of the distinction depends upon whether those unfair labor practices, either alone or when added to the pre-strike actions, were sufficient to irremediably undermine the union's majority status. This, again, is precisely the issue which the ALJ confronted and, based upon his firsthand observation of the witnesses, answered in the negative. The ALJ found:

"The Board has acknowledged that not all 'serious unfair labor practices ... are sufficiently egregious to warrant a bargaining order.' Although the line between patterns of misconduct which meet the test of pervasiveness is seldom free from doubt, having considered the total circumstances in this case, on balance, I am not convinced that the unfair labor practices herein were of a degree sufficient to prevent the holding of a free and fair election in the future . . . ."

ALJ opinion at 22, *reprinted at* 37a. This conclusion is, in my view, supported by substantial evidence while the contrary conclusion of the Board, rendered on the cold record, is not.[2]

---

2. While I appreciate the thoughtful comments made in the concurring opinion, I must respectfully take issue with its conclusion that I have "unjustifiably dismiss[ed]" the Board's explicit finding on this issue. To the contrary, I have applied the standard of review articulated by our recent en banc cases and concluded that the Board's determination that the post-strike unfair labor practices render a fair election unlikely is not supported by substantial evidence. I so conclude because of my belief that

the atmosphere of the workplace, the effect of the unfair labor practices on the employees, and possibility of a fair election are, if not solely questions of fact, at the very least issues uniquely suited to determination by the ALJ, who has heard the live testimony and observed the demeanor of the witnesses. Thus, even if I believed the question to be as close as the concurring judge feels that it is, I would still defer to the "long-standing policy of the NLRB [and the courts] to attach great weight to the

In sum, I find the facts in *K & K Gourmet Meats* and the present case to be indistinguishable in any significant respect and the policy interests to be identical. Having no indication that *K & K* does not continue to be good law, I consider it to be controlling here.[3]

### III.

To conclude, I would hold this court's decision in *K & K Gourmet Meats* to be controlling on its facts. Beyond that, I believe the facts of this case to be so far removed from *Gissel*, and, in fact, from this court's most recent divided opinion in *Permanent Label*, as to preclude the issuance of a bargaining order on the authority of those cases. While it is fundamental to our common law system that existing precedents be extended to new or differing factual situations, there comes a point where to go further is to do violence to the very policy underlying the early decision. In my opinion, that point has been reached in this

case. The Supreme Court in *Gissel* simply never intended its extraordinary remedy to be expanded to the point where it becomes an equally attractive—or, in some cases, more attractive—alternative to a Board election. Nonetheless, a close reading of this case and its comparison with the facts of *K & K Gourmet Meats* leads me to the conclusion that current Board policy in this area has, in some cases, made it easier for a union to obtain a bargaining order than to prevail in a secret ballot election. The result of our enforcement of a bargaining order in such a case is to countenance the avoidance of an election and seeking of a bargaining order as a legitimate union campaign tactic at the expense of employee free choice. Even the dissent in *K & K Gourmet Meats* recognized this fact.[4] To me, such a result is so far beyond a reasonable reading of the Act or the *Gissel* opinion that I do not believe that any standard of review, even that articulated by the majority, is so strict as to leave us powerless to disapprove it.[5]

credibility resolutions [and like questions such as mental state and workplace atmosphere] of an administrative law judge to the extent they are based on testimonial evidence of live witnesses and the hearing judge has had the opportunity to observe their demeanor." *Eastern Engineering & Elevator Co. v. N. L. R. B.*, 637 F.2d 191, 197 (3d Cir. 1980). *Accord, ABC Trans-National Transport v. N. L. R. B.*, 642 F.2d 675 (3d Cir. 1981). *Cf. N. L. R. B. v. Permanent Label Corp.*, 657 F.2d at 528 (Aldisert, J., concurring) ("the rigors of the selection procedure and the statutory protections of ALJ independence suggest to me that the federal judiciary need not look down its collective nose at ALJ decisions"). I feel much more secure resting an important decision implicating industrial democracy on a firsthand factual determination than on the nebulous concept of "Board expertise." *See Hedstrom Co. v. N. L. R. B.*, 629 F.2d at 324 (Rosenn, J., dissenting); Getman & Goldberg, *The Myth of Labor Board Expertise*, 39 U.Chi.L.Rev. 681 (1972). If *Permanent Label* counsels that an ALJ's determination of the unlikelihood of a fair election is to be respected because it is based upon firsthand observation of the witnesses, should not the same respect be afforded where, as here, the ALJ reaches the opposite conclusion?

3. Additionally, I do not read *K & K Gourmet Meats* as suggesting any hostility toward bargaining orders per se (*see* majority op. at 1213) and thus do not believe it to be in any way affected by the court's recent en banc decision in *Permanent Label*. In *K & K*, such hostility was suggested by the dissent, *see* 640 F.2d at

470 (Gibbons, J., dissenting), and explicitly disclaimed by Judge Rosenn, *see id.* at 467–68 n.3.

4. The dissent observed:
 "We are all well aware that in recent years labor unions have been winning far fewer contested elections than heretofore. A *Gissel* order insulates a union from the hazards of an election, and arguably tilts the scale too far in the union's favor. But the Supreme Court interpreted the Act in the *Gissel* cases to give the Board that authority, and Congress has not chosen to react. If I were a congressman requested to vote on overruling *Gissel*, I am not sure how I would vote." 640 F.2d at 473 (Gibbons, J., dissenting).
 In this case, the union had achieved at best a bare card majority in a relatively small bargaining unit. While the majority correctly observes that the small size of the unit may magnify the effect of employer unfair labor practices and may more quickly undermine the union's majority, the reverse is also true. In such a small unit, the acceptance of only one or two unreliable cards may result in the certification of a union, without an election, against the wishes of the majority of employees. In this case, not only has there never been an election, but the union withdrew its petition for an election as soon as the employer committed any action upon which it could base a request for a bargaining order. This withdrawal came at the outset of the strike and before the post-strike unfair labor practice which the majority finds to be of such significance.

5. I note particularly that the recent decision of the Supreme Court in *Charles D. Bonanno Lin-*

Accordingly, I would grant the petition for review and deny the cross-application for enforcement.

### On Denial of Rehearing *

GARTH, J.

I would grant the petition for rehearing because I agree with the petitioner and with Judge Van Dusen's dissent that the panel result here is in direct conflict with our decision in *NLRB v. K & K Gourmet Meats*, 640 F.2d 460 (3d Cir. 1981). Moreover, the Board's reasoning in issuing a bargaining order here, rather than ordering the preferred remedy of an election, is not only contrary to the teaching of *NLRB v. Gissel Packing Co.*, 395 U.S. 575, 89 S.Ct. 1918 (1969), but in the words of Judge Van Dusen it is "nothing less than a perversion of [Gissel] . . ." (Van Dusen, J., dissenting, *supra* at p. 1216). In essence, by upholding the Board's bargaining order, the panel has virtually given *carte blanche* to the Board to impose bargaining orders when the spirit moves it, and to do so in complete disregard of *Gissel*.

Because I have previously expressed myself on this subject in a number of opinions, the most recent of which are *NLRB v. Permanent Label Corp.*, 657 F.2d 512, 528 (3d Cir. 1981) (en banc) (Garth, J., dissenting); *NLRB v. Eastern Steel*, 671 F.2d 104, 112 (3d Cir. 1982) (Garth, J., dissenting), and *NLRB v. National Car Rental*, 672 F.2d 1182, 1191 (3d Cir. 1982) (Garth, J., dissenting), I see no need to repeat my views which I have set forth in those writings.

I would therefore grant the petition for rehearing in this case.

WEIS, J., concurs.

*en Service, Inc. v. NLRB,* —— U.S. ——, ——, 102 S.Ct. 720, 727, 70 L.Ed.2d 656, relied on by the majority, held precisely that the courts should not substitute their judgment for that of the Board "with respect to the issues that Congress intended the Board should resolve." It distinguished the argument in the Chief Justice's dissent by noting that the dissent "does not suggest that the Board seeks here to promote illegitimate ends." *Id. Bonanno*, therefore, provides no authority for the proposition that we are powerless to act when convinced that the Board is applying *Gissel* beyond where the Supreme Court, and by tacit acceptance Congress, intended.

\* HUNTER, J., would grant rehearing.