**MATSON TERMINALS, INC., Petitioner,**

v.

**NATIONAL LABOR RELATIONS BOARD, Respondent.**

No. 96–1275.

United States Court of Appeals, District of Columbia Circuit.

Argued March 21, 1997.

Decided June 10, 1997.

Eugene Scalia,Washington, DC, argued the cause for petitioner, with whom Kenneth W. Anderson and Scott A. Kruse, Los Angeles, CA, were on the briefs.

Meredith L. Jason, Attorney, National Labor Relations Board, argued the cause for respondent, with whom Linda R. Sher, Associate General Counsel, Aileen A. Armstrong, Deputy Associate General Counsel, and Peter D. Winkler, Supervisory Attorney, were on the brief.

Before GINSBURG, SENTELLE and HENDERSON, Circuit Judges.

Opinion for the Court filed by Circuit Judge SENTELLE.

Dissenting opinion filed by Circuit Judge HENDERSON.

SENTELLE, Circuit Judge:

Matson Terminals, Inc. petitions for review of a National Labor Relations Board ("NLRB") order finding that the company violated sections 8(a)(3) and (1) of the National Labor Relations Act ("the Act") by accelerating the promotion of unit employees to supervisory positions to interfere with union activity and avoid a bargaining obligation. Although the evidence before the Board supported the company's position that the promotions were part of a reorganization which the company had planned to undertake in any event, nonetheless substantial evidence supported the Board's conclusion that in determining the timing of the promotions the company acted because of a requested union recognition and in order to exclude the promoted employees from the requested bargaining unit. Therefore, given the leniency of the standard of review, we deny the petition for review of the company and grant the Board's cross-petition for enforcement.

## Background

Petitioner Matson Terminals is engaged in the business of stevedoring and terminal operation services in southern California. Matson employees work in the terminal yard, or on the vessels, or in planning. Until the mid–1970's, the title of employees charged with planning the loading and unloading of ships was "vessel planner." In the mid–1970's, Matson hired additional planners and began calling the incumbent employees "senior planners." In 1992, Matson changed the job title from "senior planner" to "senior planning supervisor." In that year, those planning employees affected by the change, previously receiving hourly wages, became salaried, but their overall compensation remained essentially the same. Their job duties did not change, and the company does not now dispute that the "senior planning supervisors" remained employees covered by the Act, rather than supervisors exempted from the Act. Structurally, the company divided its planning work among three categories of employees, vessel planner, vessel superintendent, and yard superintendent positions, with each category being responsible for the portion of the job suggested by the nomenclature.

On May 13, 1994, Matson's senior vice president of operations sent a memorandum to Matson's chief executive officer calling for a reorganization integrating "all planning

processes from the gate to the vessel." Thereafter, the company undertook a restructuring of its planning operation based on the senior vice president's concept. In the restructuring, Matson upgraded the requirements for new hires in the planning positions; began to rotate new hires in the relevant positions through all operations, including yard, vessel, and planning; and hired nine new "superintendents" to undergo the rotation. In September 1994, the company held a management retreat. At the retreat, participants discussed changes in the company's organizational structure, including the interrelatedness of the vessel planning, vessel superintendent, and yard superintendent positions.

In January of 1995, the Marine Clerks Association, International Longshoremen's and Warehousemen's Union, Local 63 ("the union") began an organizing campaign among the company's vessel planners. The union obtained signed authorization cards from a majority of the senior vessel planning supervisors. On February 6, officers of the union met with the company's terminal manager, informed the company that the union had obtained authorization cards from a majority of the senior vessel planning supervisors, and requested that the company recognize the union as the bargaining representative of those employees. The company advised the union officials that it would respond to the request for recognition in a few days.

Shortly after the union's request for recognition, the terminal manager informed higher officials of the company of the union's request. Senior officials of the company decided to meet to discuss the company's already existing integration plans. Beginning February 8, through such meetings and other actions, the company proceeded with the previously discussed restructuring. Among other things, it eliminated the position of senior vessel planning supervisor, and created a new position called "Superintendent, Terminal Operations." Within a week following the union's request for recognition, the company had created the new positions, promoted the incumbent "supervisors" into those positions, and directed those employees to begin four-month rotations through the three stages of the company's operations. These promotions were met with varying reactions by the incumbents.

On February 14, the union sent a letter to the company protesting the promotion of the senior vessel planning supervisors without consulting the union, and complaining about the company's failure to respond to the February 6 request for recognition. On February 15, the union filed with the Board an election petition on behalf of the senior vessel planning supervisors. On February 17 the company notified the union that it was refusing recognition on the ground that the senior vessel planning supervisors were *statutory* supervisors. *See* 29 U.S.C. § 152(3) (1973). On March 2, the union filed the charge that gave rise to the General Counsel's complaint filed June 16, 1995.

On February 23, 1996, after a hearing on the above matters, an administrative law judge ("ALJ") entered the decision in which he concluded that the company's eradication of the bargaining unit was an unfair labor practice in violation of sections 8(a)(1) and (3) of the Act done in direct response to the union's request for recognition. On July 31, 1996, the Board entered its decision and order affirming the ALJ and largely adopting his decisions, ruling, and finding. The company now petitions this court for review.

### Analysis

The Board's decision in this case is consistent with applicable principles of labor law. Section 8(a)(1) of the Act, 29 U.S.C. § 158(a)(1) (1994), declares it an unfair labor practice for an employer "to interfere with, restrain or coerce employees in the exercise of their rights guaranteed in section 7 [of the Act]." Section 8(a)(3) of the Act, 29 U.S.C. § 158(a)(3) (1994), declares it an unfair labor practice for an employer to discriminate "in regard to hire or tenure of employment or any term or condition of employment to encourage or discourage membership in any labor organization...." Both the Board and the courts have long held that an employer who promotes employees to supervisory positions to strip them of their right of self-organization because of a union campaign violates these sections. *See, e.g., Hospitality*

*Motor Inn, Inc.*, 249 N.L.R.B. 1036, 1037, 1980 WL 11507 (1980), *enf'd.*, 667 F.2d 562 (6th Cir.), *cert. denied*, 459 U.S. 969, 103 S.Ct. 298, 74 L.Ed.2d 280 (1982); *United Oil Mfg. Co.*, 254 N.L.R.B. 1320, 1324–25 (1981), *enf'd. on other grounds*, 672 F.2d 1208 (3d Cir.), *cert. denied*, 459 U.S. 1036, 103 S.Ct. 446, 74 L.Ed.2d 601 (1982). The Board in this case and previously has interpreted these sections of the Act to be equally applicable where an employee accelerates a promotion or other employment action affecting employee status in response to union activity even if it would eventually have taken the same action without the union activity. *See, e.g., A.M.F.M. of Summers County, Inc.*, 315 N.L.R.B. 727, 730–31, 1994 WL 702207 (1994), *enf'd.*, 89 F.3d 829 (4th Cir.1996) (promotion to supervisor status).

■ While the Act may not unambiguously outlaw this conduct on the part of an employer, we review the Board's determinations of the applicability of the Act under the *Chevron* standard, *Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 842–44, 104 S.Ct. 2778, 2781–83, 81 L.Ed.2d 694 (1984), permitting an agency's construction of ambiguities in its statute to stand, provided it is reasonable. Whatever ambiguity there is in the Act, we cannot say that the Board has resolved it unreasonably. It is perfectly reasonable for the Board to determine, as it has, that an employer, upon learning of employee union activity, cannot preempt a potential bargaining obligation by promoting or discharging all the unit employees.

That said, whether an employer's action constitutes unlawful discrimination depends upon the employer's motive. Here the ALJ found, and the Board affirmed, that the company had accelerated the reorganization of the relevant positions to eradicate the bargaining unit based, at least in part, on a motive of anti-union animus, triggered by the protected conduct of the employees whom the union sought to organize. While the petitioner argues that it would eventually have executed the same reorganization with or without the protected conduct, it does not seriously contest the conclusion that it accelerated the timing in response to the union

recognition request. In any event, we must uphold the finding of unlawful motive by the Board so long as there is substantial evidence in the record to support it. 29 U.S.C. § 160(e); *see Passaic Daily News v. NLRB*, 736 F.2d 1543, 1551–52 (D.C.Cir.1984). The present record contains ample support. In the first place, the proximity between union activity and the employer's action by itself is substantial circumstantial evidence. *Teamsters Local 171 v. NLRB*, 863 F.2d 946, 955 (D.C.Cir.1988), *cert. denied*, 490 U.S. 1065, 109 S.Ct. 2063, 104 L.Ed.2d 628 (1989). But here there is far more than proximity. Matson admitted at the hearing that the union activity "focused the company's attention" on the need to implement the plan expeditiously. That by itself makes out a *prima facie* case required under the law.

■ Under the *"Wright Line"* test, a familiar doctrine of labor law, when the General Counsel has established a *prima facie* showing, as in this case, sufficient to support an inference that the protected conduct was a motivating factor in the employer's decision, the burden shifts to the company to show that the conduct would have taken place even in the absence of the protected conduct. *Wright Line*, 251 N.L.R.B. 1083, 1089 (1980), *enf'd.*, 662 F.2d 899 (1st Cir.1981), *cert. denied*, 455 U.S. 989, 102 S.Ct. 1612, 71 L.Ed.2d 848 (1982). *See NLRB v. Transportation Management Corp.*, 462 U.S. 393, 401–03, 103 S.Ct. 2469, 2474–75, 76 L.Ed.2d 667 (1983) (approving *Wright Line* test). Matson contends that it has countered the *prima facie* case because it has offered, and the ALJ accepted, "very credible evidence that it was working toward implementation of its plan long before February 11," the date of the protected conduct. *Matson Terminals Inc.*, 321 NLRB No. 124, at 7, 321 N.L.R.B. 879, ——, 1996 WL 433973 (1996). However, this does not defeat the *prima facie* case.

The Board's decision was premised not upon a finding that anti-union animus caused the company to implement its reorganization but upon a finding that anti-union animus caused the company to implement the reorganization when it did. That is a factual question. As we noted above, the Board's

factual findings, including motive, are conclusive as supported by substantial evidence on the record as a whole. 29 U.S.C. § 160(e). *Universal Camera v. NLRB*, 340 U.S. 474, 477, 488, 71 S.Ct. 456, 464–65, 95 L.Ed. 456 (1951). That factual finding being accepted, the only remaining question is whether the Board was unreasonable in its interpretation that the legal effect of a change in timing, at least on the facts of this case, is the same as the effect of a change in the nature of the reorganization itself. We cannot conclude that it was unreasonable.

The company may argue, credibly, that even without the recognition request, it would have completed the reorganization in time to have eradicated the bargaining unit in the same way that its accelerated reorganization did. The evidence, however, is hardly so compelling in that direction that the Board was required to so find. Indeed, it is quite reasonable of the Board to have determined that management witnesses' testimony that the union's request caused them to "get off the dime" made a plain record that something of substance did change. Conceivably there could be a case in which a change in timing of a management decision triggered by protected conduct would be so *de minimis* that the Board could not reasonably conclude that the employees or union had suffered adverse consequence as a result. This is not that case, and we need not decide the legal ramifications of such facts, as we do not have them before us.

Matson argues that the Board's decision here is the establishment of a *per se* liability standard inconsistent with our previous applications of *Wright Line.* That is, in previous cases we have concluded that even where the General Counsel had established a *prima facie* case of anti-union animus, "the employer may avoid liability by demonstrating by a preponderance of the evidence that the" alleged unfair labor practice would have occurred even absent the protected conduct. *Synergy Gas Corp. v. NLRB*, 19 F.3d 649 (D.C.Cir.1994) (internal quotations and citation omitted). In Matson's view, the Board's decision in this case creates a *per se* rule inconsistent with that line of decisions, by "tying the hands of employers, no matter to what extent they have pursued a prior legitimate business plan, once a union demands recognition of employees who will be affected by that plan." We do not find the Board's decision to establish such a *per se* rule. The Board did not have before it a decision where dates for the reorganization had been set and were left in place after the request for recognition, nor even where management had fixed its plans for establishing such dates. The Board did not purport to establish a rule that would apply if it faced such facts. When it does face such facts, the Board can rule; if necessary, we can review that ruling. That is not this case.

### Conclusion

For the reasons set forth above, we conclude that the Board did not err. We therefore deny the petition for review and allow the cross-petition for enforcement.

KAREN LeCRAFT HENDERSON, Circuit Judge, dissenting:

The majority's otherwise fine opinion suffers only from a disjunction with reality. Matson not only may argue, as the majority states, but *has* argued "credibly, that even without the recognition request, it would have completed the reorganization in time to have eradicated the bargaining unit in the same way that its accelerated reorganization did." Maj. Op. at 304. Matson introduced evidence that it had planned the reorganization in spring 1994, had taken a number of steps toward implementation—including restructuring the staff that served vessels not owned by Matson and hiring new, more qualified personnel—during 1994 and early 1995 and would have completed the conversion of the planners' positions by March 13, 1995, when a new Operations Manager came on board. The Board acknowledged that the testimony of Matson's Vice President and Area Manager, which the General Counsel failed to refute, showed "that [Matson] would have acted in March 1995 if it had no bargaining obligation." *Matson Terminals, Inc.,* 321 NLRB No. 124 at 1, 321 N.L.R.B. 879, ——, 1996 WL 433973 (1996), *reprinted at* App. 2. Thus, the date the reorganization would have been completed absent any accel-

eration, March 13, occurred only 26 days after the date the Union filed its petition to represent the planners, February 15.

Under the Board's workforce-in-flux doctrine, no election should have been held during that period. *See, e.g., Hughes Aircraft Co.*, 308 N.L.R.B. 82, 83 (1992) (election not appropriate if substantial change to workforce is "imminent and certain"). Even if the doctrine is inapplicable, it is unreasonable to believe that an election could have been held and the Union certified (assuming it won) between February 15 and March 13. As the Board's counsel conceded at oral argument, an election could not have been held "[i]f [the reorganization] had definitely been done on March 13." Thus, under the Board's own assumptions, the Union would not have represented the planners before their positions became supervisory; it could not have represented them thereafter. In other words, Matson's one-month acceleration of the reorganization had no actual impact on the unionization effort and this *is* that *de minimis* case in which "the Board could not reasonably conclude that the employees or union had suffered adverse consequence." Maj. Op. at 304. Because the Board did so conclude, I would grant the petition. Respectfully, I dissent.